**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

HOWARD TRUMAN JACOBS; ROBERT
EDWIN WILLIAMS; JOHN T.
GARBROUGH; HERMAN SHARP;
PAUL E. HILLIKER; C.  W. PICKETT;
LARRY C. RICHERSON; ALBERT C.
SMITH; RONALD B. HAHN;
WILLIAM F. SETZER; LLOYD D.
RAFFALDT; DARRELL R. LANGFORD;
DAVID TAYLOR; MICHAEL E. LORMAN;

JOHN W. SMITH; RANDAL J. ADAMS;
GARY W. WAMPLER; JAMES BURDEN;
GILES S. FISHER, JR.; MICHAEL
MCCORKEL; JAMES PULLEY; KENDALL
GOODMAN; DEBORAH GOODMAN,
Plaintiffs-Appellants,

v.

CENTRAL TRANSPORT, INC.,
Defendant-Appellee.

No. 95-2395

HOWARD TRUMAN JACOBS; ROBERT
EDWIN WILLIAMS; JOHN T.
GARBROUGH; HERMAN SHARP;
PAUL E. HILLIKER; C. W. PICKETT;
LARRY C. RICHERSON; ALBERT C.
SMITH; RONALD B. HAHN;
WILLIAM F. SETZER; LLOYD D.
RAFFALDT; DARRELL R. LANGFORD;
DAVID TAYLOR; MICHAEL E. LORMAN;

JOHN W. SMITH; RANDAL J. ADAMS;
GARY W. WAMPLER; JAMES BURDEN;
GILES S. FISHER, JR.; MICHAEL
MCCORKEL; JAMES PULLEY; KENDALL
GOODMAN; DEBORAH GOODMAN,
Plaintiffs-Appellants,

v.

CENTRAL TRANSPORT, INC.,
Defendant-Appellee.

No. 95-2396

HOWARD TRUMAN JACOBS; ROBERT
EDWIN WILLIAMS; JOHN T.
GARBROUGH; HERMAN SHARP;
PAUL E. HILLIKER; C. W. PICKETT;
LARRY C. RICHERSON; ALBERT C.
SMITH; RONALD B. HAHN;
WILLIAM F. SETZER; LLOYD D.
RAFFALDT; DARRELL R. LANGFORD;
DAVID TAYLOR; MICHAEL E. LORMAN;

JOHN W. SMITH; RANDAL J. ADAMS;
GARY W. WAMPLER; JAMES BURDEN;
GILES S. FISHER, JR.; MICHAEL
MCCORKEL; JAMES PULLEY; KENDALL
GOODMAN; DEBORAH GOODMAN,
Plaintiffs-Appellees,

v.

CENTRAL TRANSPORT, INC.,
Defendant-Appellant.

No. 95-2397

Appeals from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
Charles K. McCotter, Jr., Magistrate Judge.
(CA-92-17-7-F, CA-92-478-5-F)

Argued: April 4, 1996

Decided: May 3, 1996

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

_____

Affirmed in part and reversed and remanded in part by unpublished
opinion. Judge Russell wrote the majority opinion, in which Judge
Widener joined. Judge Hall wrote an opinion dissenting in part.

_____

3

**COUNSEL**

**ARGUED:** Richard Lynn Masters, MASTERS, MULLINS & ARRINGTON, Louisville, Kentucky, for Appellants. John James Doyle, Jr., CONSTANGY, BROOKS & SMITH, Winston-Salem, North Carolina, for Appellee. **ON BRIEF:** Junius B. Lee, III, LEE & LEE, Whiteville, North Carolina, for Appellants. M. Ann Anderson, CONSTANGY, BROOKS & SMITH, Winston-Salem, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

RUSSELL, Circuit Judge:

The plaintiffs are 21 current and former lease operators for Central Transport, Inc. ("Central Transport"), a trucking company based in High Point, North Carolina. As lease operators, the plaintiffs were independent contractors, not employees of Central Transport. The plaintiffs owned and operated their own tractors and hauled a variety of bulk commodities in trailers provided by Central Transport. The plaintiffs entered into a series of standard equipment leases with Central Transport; each lease did not govern a particular trip, but all trips made by the lease operator during the lease period. The 21 plaintiffs reside in various states and operated out of Central Transport terminals across the eastern United States.

Of the several claims the plaintiffs brought against Central Transport, one alleged that Central Transport had overcharged them for workers' compensation insurance. After a bench trial before a magistrate judge,[1] the magistrate judge held that Central Transport had

_____

[1] The parties agreed to try this case before a magistrate judge, pursuant to 28 U.S.C. § 636(c)(1). The parties have elected to appeal the magistrate judge's decision directly to the Fourth Circuit, pursuant to 28 U.S.C. § 636(c)(3).

4

breached its contract and violated a regulation of the Interstate Commerce Commission ("ICC"), 49 U.S.C. § 1057.12(i). The magistrate judge rejected the plaintiffs' claim that Central Transport had committed an unfair or deceptive trade practice, in violation of the North Carolina Deceptive Trade Practices Act (the "Act"), N.C.G.S. § 75-1.1, et seq.

Both sides contest the magistrate judge's decision. The plaintiffs challenge the magistrate judge's conclusion that Central Transport did not commit an unfair or deceptive trade practice. The plaintiffs pressed this claim because they will receive treble damages under the Act if they can prove that Central Transport committed an unfair or deceptive trade practice. In its cross-appeal, Central Transport asserts that its actions did not even constitute breach of contract, let alone an unfair or deceptive trade practice. Central Transport, alternatively, contests the magistrate judge's measure of damages for the breach of contract.

We agree with the magistrate judge that Central Transport did not commit an unfair or deceptive trade practice. However, we disagree with the magistrate judge's factual finding that Central Transport overcharged the plaintiffs for workers' compensation insurance. Because the magistrate judge relied on this factual finding to conclude that Central Transport violated an ICC regulation and breached its leases, we reverse the portion of the judgment relating to workers' compensation insurance and remand for a correction of the damage award.

I.

The plaintiffs filed two separate complaints against Central Transport, which the district court consolidated before trial. Along with a number of minor claims and allegations, these complaints describe two areas of serious wrongdoing. First, the plaintiffs allege that, over the years, Central Transport failed to pay its lease operators the full portion of the freight revenues owed to its lease operators under the terms of their leases and covered up these underpayments by failing to provide its lease operators with the information required to calculate their pay. Second, the plaintiffs allege that Central Transport overcharged its lease operators for workers' compensation insurance

and used the premiums to subsidize the workers' compensation insurance policy that Central Transport maintained for its own employees.

Despite the plaintiffs' accusations that Central Transport engaged in shady and underhanded business practices, the facts reveal that Central Transport treated its lease operators with fairness and integrity.

A. Driver pay formula

For their compensation, lease operators receive a portion of the freight revenues billed to Central Transport's customers for each trip made. The leases clearly state the "driver pay formula" used by Central Transport to determine the lease operator's portion of the freight revenues.

Beginning in January 1984, Central Transport adopted an extremely complicated driver pay formula, which resulted from a new requirement imposed by the ICC on motor carriers in the early 1980s. The ICC required motor carriers to roll all fuel surcharges into their freight rates. It also mandated that lease operators receive a minimum of twelve cents per mile if the freight rates contained rolled-in fuel surcharges.

Most motor carriers simply rolled the fuel surcharges into their rates and maintained the same pay percentage arrangement in effect before the roll-in occurred. This action lowered the overall revenue paid to the lease operators. Unlike its competitors, Central Transport sought to ensure that its lease operators received the same amount of revenue that they did before the fuel surcharges were rolled into the freight rates. The driver pay formula became more complicated because it had to keep track of the rolled-in fuel surcharges (i.e., the "internal fuel surcharge"). When the ICC imposed new fuel surcharges in 1989, the driver pay formula became even more complicated because the formula also had to track these"external" fuel surcharges to ensure that the lease operators' overall revenue did not decrease.

In June 1991, Central Transport abandoned its complicated driver pay formula for a simpler mathematical expression. It is clear, how-

6

ever, that Central Transport used a complicated formula between 1984 and 1991 to protect the lease operators, not to bewilder them.

The lease operators received bi-weekly settlement statements that showed their portion of the freight revenues, as calculated by Central Transport. Although the statements were required to state all the information required for the lease operators to calculate their pay on their own--thus ensuring that they received the correct amount--the statements often lacked critical information. The plaintiffs believe that Central Transport has underpaid them over the years.

In fact, it has not. During discovery, the parties engaged an accounting firm to conduct an independent audit of Central Transport's pay records. The audit consisted of a detailed review of randomly sampled transactions involving all of the plaintiffs. The auditors examined shipping records, driver pay documentation, applicable contracts or tariffs, and other records to determine the accuracy of the pay received by the plaintiffs. The audit revealed that, despite the complexity of the driver pay formula, Central Transport paid its lease operators correctly for the work performed. Although Central Transport made some minor errors here and there, the errors tended to favor the plaintiffs. The audit revealed no systemic underpayment of the lease operators.

Many of the plaintiffs testified that they believed they were receiving between 60 and 62 percent of the freight revenues billed to Central Transport's customers. The audit revealed that, between 1979 and January 1984, the lease operators received 60 percent of the freight revenue. When Central Transport adopted its more complicated driver pay formula in 1984, the lease operators' payments increased to 66.1 percent of the freight revenue. Thus, between 1984 and 1991, the plaintiffs received more than they thought they were entitled to receive. Instead of cheating the lease operators out of their pay, Central Transport treated them fairly.

The magistrate judge did conclude that Central Transport violated federal regulations by failing to provide the plaintiffs with adequate pay documentation. However, it found that there was nothing inherently unfair or deceptive about the pay documentation Central Transport provided. Furthermore, it found that the plaintiffs did not suffer

7

any material damages because they received the correct pay. The magistrate judge awarded nominal damages of $100 per plaintiff for Central Transport's technical error.

B. Workers' compensation insurance

The leases in effect before March 1991 required the lease operators to purchase workers' compensation insurance through Central Transport. Central Transport deducted funds from the lease operators' pay and used those funds to purchase the insurance. Central Transport covered its lease operators under its own workers' compensation policy, the same policy it used to cover its own employees. However, most of the plaintiffs did not realize they received workers' compensation coverage through Central Transport's employee group insurance policy instead of through individual policies.

As the price of workers' compensation insurance rose in the late 1980s, lease operators began to complain about the high cost of workers' compensation insurance. In response to these recurring complaints, and out of a desire to reduce its overall workers' compensation insurance exposure, Central Transport amended the workers' compensation insurance requirement. Since March 1991, the lease requires lease operators to obtain their own workers' compensation insurance. Lease operators also have the option of obtaining occupation accident insurance, a lower-quality policy that covers fewer injuries but at a lower premium. The lease requires only that lease operators furnish Central Transport with proof of insurance coverage.

Before 1991, when lease operators were still covered under Central Transport's group policy, the plaintiffs paid for their insurance according to a long-standing, well-published formula used to calculate their premiums:

Premium = Gross Pay X .3333 X State Rate

Central Transport communicated this formula to its lease operators by distributing memoranda and by including the formula in the leases. Liberty Mutual Insurance Company ("Liberty Mutual"), Central

8

Transport's workers' compensation insurance carrier, provided the formula to Central Transport. The same formula was used to determine the rates for the drivers employed by Central Transport. Central Transport, however, paid the workers' compensation premiums for its own employees.

The magistrate judge found that Central Transport used the lease operators' premiums to subsidize its cost of providing workers' compensation insurance to its employees. The magistrate judge relied on statistical data introduced by the plaintiffs at trial, which established the following facts:

> In 1988, Central Transport paid a workers' compensation premium of $1,297,088, of which the lease operators contributed $341,682, or 26 percent.

> In 1989, the total premium was $1,085,508, of which the lease operators paid $342,187, or 31 percent.

> In 1990, the total premium was $1,342,373, of which the lease operators paid $493,311, or 37 percent.

> Between 1988 and 1990, the lease operators comprised less than 20 percent of the total work force.

The magistrate judge agreed with the plaintiffs that the evidence demonstrated that Central Transport used the lease operators' premiums to subsidize its own cost of providing workers' compensation insurance to its employees.

Leases between motor carriers and lease operators must "specify that the lessor is not required to purchase or rent any products, equipment, or services from the authorized carrier as a condition of entering into the lease arrangement." 49 C.F.R. § 1057.12(i) (1995). Central Transport's leases did in fact contain such a provision. The magistrate judge concluded that Central Transport violated 49 C.F.R. § 1057.12(i) and breached its leases by providing workers' compensation coverage to the lease operators under its company-wide workers' insurance policy. Although Central Transport did not actually provide

9

the workers' compensation insurance to the lease operators (Liberty Mutual issued the coverage), the magistrate judge treated Central Transport as the provider of workers' compensation insurance because Central Transport received a benefit from including the lease operators in its group policy: Central Transport used the lease operators' premiums to subsidize its own cost of providing workers' compensation insurance to its employees. Thus, the magistrate judge concluded that Central Transport violated 49 C.F.R. § 1957.12(i) and breached the leases, and it awarded damages in the amount of $164,085.07, plus $10,867.43 in costs.

The magistrate judge did not find, however, that Central Transport's workers' compensation insurance requirement constituted an unfair or deceptive trade practice. The magistrate judge found that the leases clearly stated the lease operators' obligation to purchase workers' compensation insurance through Central Transport, and that Central Transport provided the lease operators with the formula used to calculate the lease operators' premiums.

Central Transport eventually responded to the lease operators' complaints about escalating costs of workers' compensation insurance. In 1991, Central Transport eliminated its requirement that lease operators purchase workers' compensation insurance from Liberty Mutual through Central Transport's group policy. Central Transport now requires only that the lease operators show proof that they have obtained a workers' compensation policy or an occupational accident policy from an independant insurance carrier.

C. Other claims

Of the many minor claims asserted by the plaintiffs, the magistrate judge ruled in favor of Central Transport. The magistrate judge found that Central Transport owed specific amounts to three plaintiffs for improper escrow account deductions, and additional amounts to two plaintiffs for individual pay claims. It remedied these improper deductions but held that they did not constitute unfair or deceptive trade practices.

10

II.

We first consider whether Central Transport's conduct constituted a violation of the North Carolina Unfair Trade Practices Act (the "Act"), N.C.G.S. § 75-1.1, which provides:

> Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

N.C.G.S. § 75-1.1(a). The plaintiffs seek to prove that Central Transport engaged in unfair or deceptive acts because an injured party under the Act can collect treble damages and attorneys fees. N.C.G.S. § 75-1.6.

The Act prohibits both "unfairness" and "deceptiveness." Hageman v. Twin City Chrysler-Plymouth Inc., 681 F. Supp. 303, 306 (M.D.N.C. 1988). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Johnson v. Phoenix Mut. Life Ins. Co., 266 S.E. 2d 610, 621 (N.C. 1980). An act or practice is deceptive "if it has the capacity or tendency to deceive." Marshall v. Miller, 276 S.E.2d 397, 403 (N.C. 1981).

Mere breach of contract does not constitute an unfair or deceptive trade practice. Bartolomeo v. S. B. Thomas, Inc. , 889 F.2d 530, 535 (4th Cir. 1989). "It is clear that the statute encompasses such things as misrepresentation and a wide variety of shady practices sometimes associated with the marketing of consumer goods and services. Whatever the limit of their reach, however, the words must mean something more than an ordinary contract breach." United Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 985, 992 (4th Cir. 1981), cert. denied, 454 U.S. 1054 (1981). A plaintiff must show "substantial aggravating circumstances attending the breach" to receive treble damages under the Act. Bartolomeo, 889 F.2d at 535.

The plaintiffs argue that Central Transport committed an unfair and deceptive trade practice by overcharging the lease operators for the

11

cost of workers' compensation insurance and using the lease operators' premiums to subsidize its cost in providing workers' compensation insurance to its own employees. The plaintiffs allege that Central Transport covered up its scheme by withholding information about the workers' compensation policy from the lease operators; in fact, the plaintiffs contend they did not even know they were covered under Central Transport's group policy instead of under individual policies.

To prove that Central Transport used the lease operators' premiums to subsidize its cost in providing workers' compensation insurance to its own employees, the plaintiffs introduced statistical information showing that the lease operators' contribution to the group plan was disproportionate to their overall representation in the workforce. The magistrate judge accepted this statistical evidence at one point in its findings of facts and conclusions of law, finding that the "lease operators' contribution to the group plan was disproportionate. The lease operators paid between 26% to 36% of Central's total workers' compensation premiums for the years 1988-90, whereas their overall representation in the Company's workforce was about 20%." Jacobs v. Central Transport, Inc., No. 92-478-CIV-5, Findings of Fact and Conclusions of Law 46 (E.D.N.C. Apr. 13, 1995).

We find that the magistrate judge clearly erred in relying on the plaintiffs' statistical evidence because it does not demonstrate that the lease operators subsidized Central Transport's workers' compensation insurance premium. According to Liberty Mutual's formula, the amount of the premium is proportionate to gross pay of the person being covered; it is not the same per person. As long as the gross pay of the average lease operator was greater than the gross pay of the average employee of Central Transport, the lease operators would have to pay a greater amount in workers' compensation insurance premiums. To determine whether the lease operators paid a disproportionate amount in premiums between 1988 and 1990, the magistrate judge should have compared their gross pay with the employees' gross pay, not their overall representation in Central Transport's workforce.

Having discounted the significance of the plaintiffs' statistical evidence, we find no evidence in the record that Central Transport over-

12

charged the lease operators on their life insurance premiums. In fact, the evidence demonstrates that the lease operators paid their fair share. Central Transport calculated the lease operators premiums according to a formula provided by Liberty Mutual, the same formula that Liberty Mutual used to calculate Central Transport's premium for coverage of its own employees. See Jacobs v. Central Transport, Inc., No. 92-478 CIV-5, Findings of Fact and Conclusions of Law 10 (M.D.N.C. Apr. 13, 1995) ("None of the rates differentiated between company drivers and lease operators."). We conclude that the magistrate judge was clearly erroneous in finding that Central Transport overcharged the lease operators on the workers' compensation insurance premiums and used the lease operators' premiums to subsidize its cost of providing workers' compensation insurance to its own employees.

The plaintiffs also argue that Central Transport committed unfair trade practices because its violations of ICC regulations demonstrate that it offended the established public policy of North Carolina. The plaintiffs claim that Central Transport violated ICC regulations by requiring the lease operators to purchase workers' compensation insurance through Central Transport, by failing to provide copies of the insurance policy to lease operators upon request, by failing to provide lease operators with the information necessary to calculate whether they were properly paid, and by making a few improper deductions from certain plaintiffs' escrow accounts.

Not every technical violation of a federal regulation constitutes a violation of public policy. Central Transport's violations of ICC regulations were also breaches of contract, and the district court remedied the violations with contract damages. These violations, however, do not demonstrate that Central Transport engaged in immoral, unethical, oppressive, or unscrupulous conduct. We see no substantially aggravating circumstances to justify trebling Central Transport's contract damages. Central Transport made a few mistakes that violated ICC regulations and that the district court remedied through damages for breach of contract. These ICC violations do not demonstrate that Central Transport engaged in unfair trade practices.

We therefore reject the plaintiffs' argument that Central Transport engaged in an unfair or deceptive trade practice.

13

III.

We next turn to Central Transport's cross-appeal. Central Transport argues that its requirement that lease operators purchase workers' compensation insurance through its group policy did not violate 49 C.F.R. § 1957.12(i) or breach the relevant provision in the leases. Alternatively, Central Transport argues that the magistrate judge miscalculated the damages for its breach.

A.

The federal regulations governing leases between motor carriers and lease operators require such leases to "specify that the [lease operator] is not required to purchase or rent any products, equipment or services from the authorized carrier as a condition of entering into the lease arrangement." 49 C.F.R. § 1057.12(i). The ICC promulgated the regulations in 49 C.F.R. § 1057 to "promote full disclosure between the carrier and owner-operator in the leasing contract, [to] promote the stability and economic welfare of the independent trucker segment of the motor carrier industry, and [to] eliminate or reduce the opportunity for skimming and other illegal practices." 44 Fed. Reg. 4680, 4680 (1979) (emphasis added). Section 1057.12(i) clearly fulfills these goals: it prevents motor carriers from extracting hidden charges from their lease operators by requiring them to purchase goods or services from the carriers at inflated prices.

The magistrate judge found that Central Transport violated 49 C.F.R. § 1057.12(i) and breached the various leases by requiring the lease operators to purchase workers' compensation insurance through Central Transport. The magistrate judge recognized that Liberty Mutual, not Central Transport, provided the insurance to the lease operators. Nonetheless, the magistrate judge construed Central Transport as a provider of workers' compensation insurance because Central Transport extracted a benefit from the insurance arrangement:

> Central was more than a mere conduit for the purchase of workers' compensation coverage for the lease operators through an independent carrier. Central included the lease operators in the Company's group policy for all of its employees. In so doing, Central used the monies collected

14

as premiums from the lease operators to subsidize Central's workers' compensation program for its employees.

\* \* \*

The lease requirement that the lease operators purchase workers' compensation insurance "through" Central did not violate the regulatory and lease provisions prohibiting a lease requirement that the lease operators "purchase . . . any products, equipment or services from" Central. 49 C.F.R. § 1057.12(i) . . . . However, when Central unilaterally decided to provide the lease operators' workers' compensation coverage through the Company's employee group plan, Central became more than a mere conduit. Central became the provider of a product or service.

Jacobs v. Central Transport, Inc., No. 92-478-CIV-5, Findings of Fact and Conclusions of Law 45-56 (E.D.N.C. Apr. 13, 1995).

We agree with the general principle implicit in the magistrate judge's holding: 49 C.F.R. § 1057.12(i) prevents a motor carrier from requiring its lease operators to obtain products, equipment, or services from a third party, where the carrier benefits from the arrangement. Although 49 C.F.R. § 1057.12(i) applies only to products, equipment, and services that the motor carrier itself provides to the lease operators, we construe the carrier to be a provider when it requires its lease operators to deal with a third party and it receives some benefit from the arrangement. The ICC enacted § 1057.12(i) to prevent a motor carrier from skimming its lease operators' profits by exacting hidden charges; a motor carrier cannot circumvent this regulation by laundering its kickback through a third party.

We disagree with the magistrate judge's conclusion that Central Transport received a benefit from its requirement that the lease operators purchase workers' compensation insurance through its group policy with Liberty Mutual. The magistrate judge found that Central Transport used the lease operators' premiums to subsidize its cost of providing workers' compensation coverage to its own employees. As we have stated in the previous section, that finding was clearly erroneous. Central Transport charged the lease operators according to a

15

formula provided by Liberty Mutual, the same formula used to calculate Central Transport's premium for coverage of its employees. There is no evidence that Central Transport would have paid a higher premium had it not included the lease operators in its workers' compensation insurance policy.[2] There is no evidence that Central Transport received any sort of kickback for funneling the lease operators' business to Liberty Mutual.

We therefore conclude that Central Transport did not violate 49 C.F.R. § 1057.12(i) or breach its leases.

B.

Even had we found that Central Transport violated 49 C.F.R. § 1057.12(i) and breached its leases with the plaintiffs by requiring the lease operators to purchase workers' compensation insurance through its group policy with Liberty Mutual, we could not have awarded any damages.

If Central Transport had breached its leases, the plaintiffs would have been entitled to compensatory damages. The purpose of compensatory damages is to restore the injured party to the party's original condition, i.e., to make the party whole. Shaver v. N. C. Monroe Constr. Co., 306 S.E.2d 519, 526 (N.C. Ct. App. 1983), review denied, 311 S.E.2d 294 (1984). For a breach of contract, the injured party shall be compensated for all losses which the fulfillment of the contract would have prevented or which the breach has caused. Coble v. Richardson Corp. of Greensboro, 322 S.E.2d 817, 822 (N.C. Ct. App. 1984).

_____

[2] There is also no evidence in the record that the lease operators would have paid lower premiums if they had received individual policies, or if they had had the option of purchasing insurance from a carrier other than Liberty Mutual. However, it is irrelevant whether the lease operators could have obtained a better price for workers' compensation insurance. The plaintiffs can establish a violation of 49 C.F.R. § 1057.12(i) only if they demonstrate that Central Transport benefitted by including the lease operators in its group policy.

16

The magistrate judge found that Central had overcharged the lease operators for the cost of workers' compensation insurance and used the difference to subsidize its cost in providing workers' compensation coverage to its own employees. The magistrate judge, however, did not award the amount of the overpayment as damages. Instead, the magistrate judge measured the plaintiffs' damages as the difference between the cost of obtaining workers' compensation insurance and the cost of obtaining occupational accident insurance.

We hold that the magistrate judge used an improper measure of damages. Central Transport did not violate 49 C.F.R. 1057.12(i) or breach its leases by requiring its lease operators to purchase workers' compensation insurance, instead of occupational accident insurance, as a condition of doing business. Nothing in the federal regulations or the leases prevented Central Transport from requiring the lease operators to purchase workers' compensation insurance instead of occupational accident insurance, or some other lower-quality insurance. Central Transport had every right to demand workers' compensation insurance as a condition of doing business. The end result of the magistrate judge's award of damages is a windfall for the plaintiffs, who receive workers' compensation insurance for the price of occupational accident insurance, a lower-quality policy.

Central Transport could only have violated 49 C.F.R.§ 1057.12(i) and breached its leases by overcharging the lease operators for the cost of the workers' compensation insurance and using the difference to subsidize its own workers' compensation insurance premium. The proper measure of damages is the amount of the overcharge. The magistrate judge should have awarded the plaintiffs' cost of obtaining workers' compensation insurance from Liberty Mutual through Central Transport's group policy, less the cost of obtaining workers' compensation insurance from Liberty Mutual through individual policies.

However, there is no evidence that Central Transport overcharged the lease operators for the cost of workers' compensation insurance. We have already discounted the plaintiffs' statistical evidence that attempted to show that the plaintiffs paid a disproportionate share of the workers' compensation insurance premium. There is no evidence that the inclusion of the lease operators in Central Transport's group policy affected the amount of Central Transport's premium for the

17

coverage of its employees. No evidence suggests that the lease operators could have purchased individual workers' compensation policies for less than the premiums paid to Liberty Mutual for their participation in Central Transport's group policy.

Because Central Transport did not overcharge the lease operators for the workers' compensation insurance, we conclude that the plaintiffs did not suffer any damages resulting from a violation of 49 C.F.R. § 1057.12(i) or a breach of the leases.

IV.

For the foregoing reasons, we affirm the magistrate judge's judgment in favor of Central Transport on the plaintiffs' claim for unfair or deceptive trade practices. We reverse the magistrate judge's judgment for the plaintiffs on their workers' compensation insurance claim. We remand for a correction of the award of damages.

<u>AFFIRMED IN PART AND</u>
<u>REVERSED AND REMANDED IN PART</u>

HALL, Circuit Judge, dissenting in part:

While I agree with most of what the majority has written, I disagree on two points. First, I believe that 49 C.F.R.§ 1057.12(i) outlaws the company store, period. The potential for abuse involved in any forced sale -- whether of socks or workers' compensation coverage -- is sufficient to render it in violation of the regulation. I disagree, then, that the plaintiffs must prove that Central Transport actually benefited from forcing their participation in its own workers' compensation plan.

As for damages, I agree that a remand is required. Though Central Transport was not entitled to be a provider of workers' compensation coverage, I know of no reason why it could not insist that such coverage be obtained. The plaintiffs' damages are not, therefore, properly measured by the cost of the much less expensive occupational accident coverage.

18

On the other hand, I would not declare that the magistrate's finding that the plaintiffs were actually overcharged (in some amount) was clearly erroneous. We were not asked to make such a holding. Central Transport conceded at argument that it offered no evidence of its own payroll from which one could find that the plaintiffs' share of the premiums was strictly proportional to their share of pay. In fact, Central Transport asserts simply that "[t]he proper measure of damages for plaintiffs' claim . . . is the difference between the amounts plaintiffs paid for their insurance and the amount they should have paid based on their percentage of representation of the work force." Brief of Appellee/Cross Appellant at 33-34. I would order that this measure of damages be applied on remand.

In these few respects, I respectfully dissent; otherwise, I join the judgment and opinion of the majority.

19