Tim **BARTOLOMEO**, d/b/a Quality Brands, Inc., Plaintiff–Appellant,

v.

**S.B. THOMAS, INC.; CPC International, Inc.,** Defendants–Appellees.

No. 89–2339.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 5, 1989.

Decided Nov. 17, 1989.

---

Denise Smith Cline (Thomas W. Steed, Jr., Barry L. Creech, Moore & Van Allen, Raleigh, N.C., on brief), for plaintiff-appellant.

Robert Ambrose Wicker (Linda S. Bellows, Smith, Helms, Mulliss & Moore, Greensboro, N.C., on brief), for defendants-appellees.

Before PHILLIPS and WILKINSON, Circuit Judges, and BRITT, Chief Judge, United States District Court for the Eastern District of North Carolina (sitting by designation).

PHILLIPS, Circuit Judge:

Tim Bartolomeo appeals, pursuant to a Rule 54(b) certification, from the district court's grant of partial summary judgment disposing of three of his four claims against S.B. Thomas, Inc. (Thomas) and CPC International, Inc. (CPC). The court granted summary judgment for defendants on Bartolomeo's claims of wrongful termination of an oral distributorship agreement, unfair and deceptive trade practices in violation of N.C.Gen.Stat. § 75–1.1, and

tortious interference with contract, but denied summary judgment on his claim of pre-termination breaches of contract.

We affirm.

## I

In October 1983, Bartolomeo entered into an oral distributorship agreement with Thomas, a subsidiary of CPC, to serve as a "multiple distributor" of Thomas' English muffins throughout North and South Carolina. Under this "two-tiered" distribution system, Thomas would contract with multiple distributors like Bartolomeo, who in turn would independently hire subdistributors to supply Thomas' English muffins within a certain region.

Bartolomeo began his multiple distributorship for Thomas on January 1, 1984. Operating under the trade name Quality Brands, he made substantial investments in equipment, office space, and promotional efforts in the course of starting up and sustaining his sole-proprietor distributorship. Over the next couple of years, Bartolomeo expanded his business by hiring his wife as an office assistant and by distributing a noncompeting product (Tastykakes), both with the blessing of Thomas.

Through it all, Bartolomeo never signed a formal written contract with Thomas. During the life of Bartolomeo's distributorship, Thomas did prepare for its distributors a form contract which provided for thirty days notice of termination and exclusivity in the distributorship. According to Thomas, existing multiple distributors, including Bartolomeo, were provided with a blank copy of that contract, but were not required to execute it because it was understood that they were already operating under the terms made express by the contract. Bartolomeo, on the other hand, claims not to recall ever having seen a copy of the form contract.

In 1986, Thomas' parent company, CPC, purchased Arnold Foods, and Thomas and Arnold Foods were grouped under Best Foods Baking Group, a division of CPC. Before that restructuring, Arnold Foods had been using a different distribution system from Thomas' and Bartolomeo thus became concerned about whether the corporate restructuring would affect his distributorship. He claims to have been given repeated assurances from regional representatives of Best Foods that his business would continue. In claimed reliance on these assurances, Bartolomeo prepared a market analysis report containing allegedly proprietary information, which he claims Thomas later used in reorganizing the region's distribution system.

In June 1987 Best Foods decided to abandon the two-tiered multiple distributorship system in favor of a single-tier system. Under the new system, Best Foods personnel would manage independent distributors, each of whom would be responsible for a single route. This reorganization required consolidating some routes in which the old Thomas and Arnold Foods distribution systems overlapped and assigning the new routes to some existing individual distributors and terminating others.

Bartolomeo was informed of this decision to reorganize the distribution system on July 21, 1987 and was told that he would be terminated "some time in 1988." On October 29, he was given formal written notice that he would be terminated effective January 2, 1988 and on that same day Best Foods offered him $65,000 for a release from liability and for permission to hire his employees. Bartolomeo asked for and was given an extension of the twenty-four hour deadline for accepting the offer, but ultimately declined it.

Bartolomeo then brought this action, alleging the four claims earlier identified, all arising out of what he claimed to be the wrongful termination of his distributorship following a series of antecedent acts on Thomas' part which constituted tortious interference with contract, violations of the state unfair trade practices law, and pre-termination breaches of contract.

The district court granted partial summary judgment, concluding that the oral distributorship agreement was one terminable at will under North Carolina law so that its termination was therefore not actionable, and that as a matter of law the defendants'

conduct did not constitute unfair trade practices under the state statute nor wrongful interference with contract under state tort law. This appeal followed. On it, Bartolomeo only challenges the court's dismissal of his wrongful termination and unfair trade practices claims; the wrongful interference with contract claim is therefore not before us, and its dismissal stands.

## II

In reviewing the district court's grant of summary judgment, we apply the same standard applied by the trial court and consider whether, viewing the facts in the light most favorable to Bartolomeo, there is any genuine issue of material fact precluding the entry of judgment as a matter of law. Fed.R.Civ.P. 56(c). As all agree, North Carolina substantive law controls, and that law "identif[ies] which facts are material." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

We take the wrongful termination and unfair trade practices claims in that order.

## A.

■ The propriety of the court's dismissal of the wrongful termination claim turns on the proper interpretation of *General Tire & Rubber Co. v. Distributors, Inc.,* 253 N.C. 459, 117 S.E.2d 479 (1960). In *General Tire,* the North Carolina Supreme Court held that while a distributorship agreement of indefinite duration is generally terminable at will, a distributor who has made substantial investments in his business is entitled to operate the distributorship for a "reasonable time." *Id.* 117 S.E.2d at 489. And in its discussion, the Court noted that what is a reasonable period of time depends on a variety of circumstances: amount of expenditures, length of time the distributorship has already run, potential for future profit, and past profitability; but that the ultimate test is not "whether distributor has recouped his expenditures, but whether he has had a fair opportunity." *Id.*

The district court read *General Tire* as holding by clear implication that a distributor who has recouped his expenses has, as a matter of law, been given a "reasonable time" to operate the distributorship. Because Bartolomeo indisputably had done so, he could not bring himself within *General Tire* 's "reasonable time" exception, and his distributorship was therefore terminable at will under the general rule. Bartolomeo challenges that reading of *General Tire,* contending, as we understand his argument, that the rule of *General Tire* mandates a factual inquiry under any and all circumstances into whether a particular distributorship had been given a "reasonable time" to operate before its termination. In support, he points to portions of the *General Tire* court's opinion which looked to factors such as the potential for future profit and the length of the distributorship in absolute terms.

We agree with the district court's reading. The *General Tire* court's references to the possibility of future profits and sheer longevity of the distributorship in that case have to be read in context. When this is done, we are satisfied that the decision does not hold, as Bartolomeo seems to argue, that even after an at-will distributor has recouped his expenses, he is entitled to continue it thereafter for a "reasonable time" as that may be determined by finders of fact on a case-by-case basis.

Unlike Bartolomeo, the distributor in *General Tire* had not recouped his investment and indeed had lost a considerable sum on expenditures when his distributorship was terminated. The trial court had refused to permit the jury to award any relief for the loss on the expenditures, and while the North Carolina Supreme Court found no error in this, it ordered a new trial on other grounds and discussed how the termination issue should be addressed at the new trial. Because there was evidence that the business was becoming increasingly unprofitable, the distributor had no right to recover "the expenditures ... as such," *id.* 117 S.E.2d at 489, but the amount of those expenditures was relevant evidence on the question of whether the distributor had had a reasonable time to operate the distributorship. There was

also evidence that the parties had contemplated continuing the distributorship for at least two years beyond the date when it was actually terminated. Thus, the jury was to decide whether the premature termination was reasonable under the circumstances and, if not, what the reasonably ascertainable net profits would have been during a hypothetical reasonable period of continued operation.

We are persuaded that the North Carolina courts would hold that *General Tire*'s narrow exception to the terminable-at-will rule has no application where the distributor has fully recouped his investment, and even made some profits, on his distributorship. Such a distributor manifestly has had a "fair opportunity" to recoup start-up outlays and bring the business into profitable operation. This, we believe, is the essence of the *General Tire* rule. The rule's concern is to protect against the general rule of termination-at-will only those who have not even had a chance to realize a return on their initial outlays. For such distributors, a multifactored analysis of the "reasonableness" of particular terminations is required to guard against intolerably harsh consequences of early terminations under the general rule. To allow juries to decide, however, the "reasonable time" for continued operation of an already profitable distributorship would virtually nullify the general rule of at-will termination and we do not believe that *General Tire* intended any such consequence. That sort of added protection against at-will termination, we believe, is still left under North Carolina law to the bargaining process.

### B.

■ Bartolomeo next contends that there were genuine issues of material fact regarding possible violations of North Carolina's Unfair and Deceptive Trade Practices Act, N.C.Gen.Stat. § 75–1.1(a) (1988) (the Act). The Act prohibits "unfair methods of competition ... and unfair or deceptive acts or practices in or affecting commerce." *Id.* Although the ultimate issue of whether a particular act or practice violates the Act is one of law for the court, disputes over the facts on which such a legal decision is based are for the trier of fact. *Hageman v. Twin–City Chrysler–Plymouth, Inc.*, 681 F.Supp. 303, 306 (M.D. N.C.1988). Bartolomeo claims that there are genuine issues of material fact here as to whether Thomas misled him into thinking that his distributorship would continue and had committed a series of other acts breaching the agreement which, because of their nature, would constitute violations of the Act.

We agree with the district court that, considering the proffered evidence in the light most favorable to Bartolomeo, the defendant's conduct would not violate the Act.

Bartolomeo first relies on his available evidence that the defendants knew as early as May 1987 that multiple distributorships such as Bartolomeo's would be discontinued and that they nonetheless gave him repeated assurances that he did not have "a thing to worry about." There is indeed a dispute as to when the decision to change the distribution system was actually made, and whether the regional representatives who spoke to Bartolomeo were merely expressing their honest opinions that he would be continued. But it is undisputed that by July 21, Bartolomeo had actual notice that he would eventually be terminated, and that on October 29 he received written notice that the termination would take effect on January 2, 1988.

Taking the relevant evidence in the light most favorable to Bartolomeo, the core of his claim here is that for a period of time in the early summer of 1987, he was "deceived" about the status of his distributorship. And he claims that this caused him to prepare a market analysis report for defendants which detailed some proprietary information about his business during this period.

■ One need not show that he was actually deceived to prevail under the Act, as long as "the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception." *Chastain v. Wall*, 78 N.C.App. 350, 337 S.E.2d

150, 154 (1985) (quoting *Overstreet v. Brookland, Inc.*, 52 N.C.App. 444, 279 S.E.2d 1, 7 (1981)). The defendant's intent or good faith is irrelevant. *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C.1981). Bartolomeo argues that under these principles, the trial court erred in ruling as a matter of law that whatever deception he may have experienced did not rise to the level of a violation of the Act.

■ The district court relied primarily on *Tar Heel Industries v. E.I. duPont de Nemours*, 91 N.C.App. 51, 370 S.E.2d 449 (1988), in reaching its legal conclusion that no statutory violation had occurred even if the facts be as advanced by Bartolomeo. The plaintiff in *Tar Heel*, a carrier service, complained that defendant duPont had violated the Act by not informing it that duPont was looking for alternative carriers while the parties were still under contract, even though duPont eventually gave a timely notice of termination. The appeals court upheld a grant of summary judgment for duPont, noting that the mere fact of termination under a terminable-at-will agreement does not amount to a violation of the Act, *Dull v. Mutual of Omaha*, 85 N.C.App. 310, 354 S.E.2d 752 (1987), and that the plaintiff had received all the notice to which it was entitled under the contract.

Bartolomeo tries to distinguish *Tar Heel* by arguing first that there was no express notice period in his oral contract, thereby presenting a genuine issue of the reasonableness of the notice he received, and second that he was not simply uninformed about the plans to change the distribution system but was "knowingly misled" by representatives of Thomas. Neither of these arguments has merit. Written contracts that Thomas had with similarly situated distributors provided for thirty days notice of termination. Although Bartolomeo had no express agreement on notice, it is undisputed that he had over five months actual notice of his termination and written notice over sixty days in advance of the effective date. On his second point, even if the statements did have a deceptive quality within the meaning of the Act, which we doubt, Bartolomeo has not shown that he "suffered *actual injury* as a *proximate result*" of these statements, *Ellis v. Smith–Broadhurst, Inc.*, 48 N.C.App. 180, 268 S.E.2d 271, 273–74 (1980) (emphasis supplied). Because he had all the notice for which he could conceivably have asked, and has not shown how the supposedly proprietary information that he gave to Thomas' representatives was misappropriated to his actual injury, the district court properly concluded that this conduct did not violate the Act.

Bartolomeo next maintains that other pre-termination breaches of the distributorship agreement, which survived the summary judgment motion, were accompanied by aggravating circumstances which constituted violations of the Act.

■ A simple breach of contract, even if intentional, does not amount to a violation of the Act; a plaintiff must show substantial aggravating circumstances attending the breach to recover under the Act, which allows for treble damages. *See United Roasters, Inc. v. Colgate–Palmolive*, 649 F.2d 985 (4th Cir.1981). In *United Roasters*, the defendant had decided to terminate an agreement under which it would manufacture and promote a product developed by the plaintiff. After the decision was made to terminate, but before notice was given, the defendant ceased performing under the contract. We upheld the plaintiff's breach of contract claim, though not on the bad faith termination theory relied upon by the district court, but nonetheless agreed with the court that no violation of the Act had occurred. Despite the defendant's complete and abrupt abandonment of the contractual relationship, we saw no suggestion of "substantial aggravating circumstances" that would justify the extraordinary treble damages recovery, and we opined that to find such factors one would probably need to demonstrate deception either in the formation of the contract or in the circumstances of its breach. *Id.* at 992.

■ Bartolomeo cites seven instances of alleged misconduct on Thomas' part that occurred after the decision to terminate and argues that these should be viewed as substantial aggravating circumstances: (1)

delayed notice of a test marketing; (2) limited time to accept a settlement offer; (3) failure to deliver products on the day he refused the offer; (4) tampering with some documents pertaining to changes in distribution methods; (5) delayed reimbursements; (6) failure to inform him of some incentive bonuses; and (7) removal after his termination of some products from the shelves to which he had delivered them.

Bartolomeo will of course have the opportunity to pursue these claims as breaches of contract. We agree, however, with the district court's legal conclusion that these acts, even if proved, would *not rise to* the level of a violation of the Act under the standards of *United Roasters.* The district court properly viewed these alleged occurrences as, at most, simple breaches of contract, not "substantial aggravating circumstances" that would justify the recovery of treble damages.

### III

For the foregoing reasons, the district court's grant of partial summary judgment is affirmed.

AFFIRMED.