Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp., 2017 NCBC 27.

| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
|---|---|
| | SUPERIOR COURT DIVISION |
| DAVIE COUNTY | 16 CVS 217 |

| | |
|---|---|
| KERRY BODENHAMER FARMS, LLC, | |
| Plaintiff, | |
| v. | ORDER AND OPINION ON DEFENDANTS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS |
| NATURE'S PEARL CORPORATION; JERRY SMITH; and LE BLEU CORPORATION, | |
| Defendants. | |

1.     In this contract dispute, Plaintiff Kerry Bodenhamer Farms, LLC ("KB Farms") contends that Defendant Nature's Pearl Corporation improperly refused to pay for part of a shipment of muscadine grapes and then terminated the governing contract without cause.  KB Farms brings claims against Nature's Pearl for breach of contract, tortious breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair or deceptive trade practices.

2.     KB Farms also asserts those claims against two additional defendants: Jerry Smith, the owner and chief officer of Nature's Pearl; and Le Bleu Corporation, another company owned by Smith.  KB Farms asserts a fifth claim against Smith and Le Bleu for tortious interference with the contract between KB Farms and Nature's Pearl.

3.     Defendants jointly moved for partial judgment on the pleadings under Rule 12(c) of the North Carolina Rules of Civil Procedure.  Smith and Le Bleu challenge all of the causes of action brought against them.  Nature's Pearl contends that the

Court should dismiss the claims against it for tortious breach of contract and unfair or deceptive trade practices.

4. Having considered the motion, the briefs in support of and in opposition to the motion, and the arguments of counsel at the hearing on February 15, 2017, the Court GRANTS in part and DENIES in part the motion.

*Wyche, P.A., by Wade S. Kolb, III, Matthew T. Richardson, and Eric B. Amstutz, and Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Kearns Davis, Eric M. David, and Kimberly M. Marston, for Plaintiff Kerry Bodenhamer Farms, LLC.*

*Wilson & Helms, LLP, by G. Gray Wilson and Lorin J. Lapidus, for Defendants Nature's Pearl Corporation, Jerry Smith, and Le Bleu Corporation.*

Conrad, Judge.

## I.

## BACKGROUND

5. The Court does not make findings of fact on a motion for judgment on the pleadings under Rule 12(c). The following factual summary is drawn from relevant allegations in the Complaint and the attached exhibits.

6. KB Farms is a North Carolina limited liability company that raises and sells a variety of crops, "including soybeans, peanuts, wheat, and muscadine grapes." (Compl. ¶¶ 1, 6.)

7. Nature's Pearl and Le Bleu are North Carolina corporations, and Smith owns all or a controlling interest of both corporations. (Compl. ¶¶ 2, 7.) Nature's Pearl sells products, such as juices and nutritional supplements, that require muscadine grapes. (Compl. ¶ 7.) Le Bleu sells bottled water. (Compl. ¶ 7.)

8. The parties' business relationship began in 2005. At that time, Smith requested that KB Farms begin growing muscadine grapes—a crop KB Farms had not previously grown commercially. (Compl. ¶¶ 8, 11.) Smith agreed to pay a $200 per ton premium in return for the exclusive right to purchase all of KB Farms' grapes. (Compl. ¶ 9.) After planting 18 acres in 2006 and 2007, KB Farms sold its first crop of muscadine grapes in 2008. (Compl. ¶¶ 11, 12.) KB Farms grew and sold grapes under this oral exclusivity agreement in 2009, 2010, and 2011. (Compl. ¶¶ 13–15.)

9. KB Farms and Nature's Pearl executed a written contract in 2012. (Compl. ¶ 18.) Styled "Exclusive Growers Muscadine Whole Grape Agreement" ("Agreement"), the Agreement grants to Nature's Pearl "the sole and exclusive right to purchase all of [KB Farms'] muscadine grapes ('whole grapes') on an annual basis" for 20 years. (Compl. Ex. A, ¶¶ 1, 8 ["Agreement"].) Nature's Pearl agreed to pay $700 per ton for the 2012 harvest, but "[f]uture prices for whole grapes shall be determined by market conditions as determined by [Nature's Pearl] for each year of this Agreement." (Agreement ¶ 2.)

10. The Agreement gives Nature's Pearl "the right to reject any whole grapes that" it determines "to be unusable" and the authority to "make the sole determination as to the quality of the product at the time of processing the whole grapes." (Agreement ¶ 4.) Specifically, Nature's Pearl has the right to "reject all whole grapes that it determines to be spoiled, rotten, molded, fermented or do not meet a minimum of 15 bri[x] sugar content at the time of processing." (Agreement ¶ 4.) The Agreement also permits the parties to terminate the contract upon 60-days'

written notice following certain conditions, including "[e]ither party's failure to comply with any term or provision of this Agreement" or Nature's Pearl's determination "that [KB Farms] has failed to supply whole grapes of suitable quality." (Agreement ¶ 11.)

11. KB Farms delivered shipments of muscadine grapes in 2012 and 2013 without incident. (Compl. ¶ 26.) It also expanded production, eventually devoting 63 acres to muscadine grapes. (Compl. ¶ 29.)

12. This dispute concerns the 2014 harvest, delivered during September of that year. Although Nature's Pearl did not reject any grapes at the time of delivery, Smith submitted only partial payment on October 15, 2014. (Compl. ¶¶ 32, 35 & Ex. B.) According to Smith, "our contract calls for 13 – 15 brix," but 47.28 tons of grapes had a brix level of 18 "and tested 0.70 alcohol." (Compl. Ex. B.) The attached check, from Le Bleu's bank account, withheld payment of $33,096.00 for that portion of the harvest. (Compl. ¶ 35.) Smith closed by stating that "[w]e will work through this next year." (Compl. Ex. B.)

13. In a responsive e-mail, KB Farms disputed Smith's interpretation of the contract. Pointing to paragraph 4, KB Farms stated that the Agreement requires "a minimum of 15 brix," not a level between 13 and 15 brix. (Compl. Ex. C; *see also* Agreement ¶ 4.) On that basis, KB Farms requested full payment. (Compl. Ex. C.)

14. The parties' relationship deteriorated. On October 29, 2014, in a letter from counsel, Nature's Pearl stated that it was "considering cancellation of your contract, but will decide in the next 60 days whether or not to do so." (Compl. Ex. D.) It further

stated that "[a]ny future business dealings will require strict compliance" with a 13-15 brix level and an alcohol content of 0.5% or less. (Compl. Ex. D.) Following up a month later, Smith asserted that the parties had a longstanding "verbal agreement" to lower the contractual brix requirement and informed KB Farms that "it is fine with me that you sell your grapes to someone else." (Compl. Ex. D.)

15. After the new year, the parties discussed the possibility of amending the Agreement. In a letter dated February 19, 2015, counsel for KB Farms stated that the company "would be willing to provide [grapes] at a desired brix level lower than what the Contract requires" but that "we would need to work with you to amend the Contract in writing." (Compl. Ex. E.) KB Farms also requested that Nature's Pearl "confirm its intention to perform its obligations under the Contract." (Compl. Ex. E.) Counsel for Nature's Pearl responded on March 16 that, "[w]ith regard to doing business going forward, [Nature's Pearl] remains willing to enter into a new agreement with [KB Farms], but only upon the terms that apply to all other suppliers . . . ." (Compl. Ex. F.)

16. Smith proposed a new contract on June 2 and requested a response within 10 days. (Compl. Ex. G.) He then informed KB Farms that, unless it signed the contract, he "would find 'another grower' to replace" KB Farms. (Compl. ¶ 43.) The deadline passed without a response, and on June 26 Smith provided written notice of termination of the Agreement "for your failure to provide suitable grapes for processing," adding that KB Farms could "still sign the new contract." (Compl. Ex.

H.)  On July 1, counsel for Nature's Pearl reiterated the written notice of termination and offer of a new contract.  (*See* Compl. Ex. J.)

17.  KB Farms objected, stating that "[t]he Contract remains in full force and effect" and that "the limited circumstances" permitting termination had not occurred. (Compl. Ex. I.)  In a letter dated July 2, KB Farms' counsel stated Nature's Pearl "is in breach of the Contract" and "has no right to terminate the Contract."  (Compl. Ex. K.)  After KB Farms stated its intent to deliver the 2015 harvest under the Agreement (Compl. ¶ 48), Nature's Pearl responded on August 18 that any attempt by KB Farms to deliver would be "criminal and civil trespass."  (Compl. Ex. N.)

18.  Around this time, Smith sent a check from Le Bleu's bank account for $33,096.00 in payment for the disputed 2014 harvest.  (Compl. Ex. M.)  KB Farms returned the check, stating that "Nature's Pearl has intentionally breached the Contract and, among other amounts, owes Kerry Bodenhamer Farms for the 2014 grapes and the entire 2015 harvest."  (Compl. Ex. O.)  KB Farms ultimately sold to a third party about 276 tons of the 2015 harvest for $400 per ton, but it was unable to find a purchaser for about 200 tons.  (Compl. ¶¶ 57, 58.)

19.  On October 23, 2015, counsel for Defendants stated that the new contract was "the only agreement under which [Nature's Pearl] and [Le Bleu] will ever do any further business with" KB Farms.  (Compl. Ex. P.)  The letter requested prompt execution of the new agreement or that KB Farms "cease further communication." (Compl. Ex. P.)

20.    KB Farms filed this action on May 11, 2016.  Defendants filed their Answer on June 22, 2016, and Nature's Pearl filed counterclaims.  Defendants jointly moved for partial judgment on the pleadings under Rule 12(c) on December 8, 2016, and the Court held a hearing on the motion on February 15, 2017, at which all parties were represented by counsel.  The motion is ripe for resolution.

## II.

## LEGAL STANDARD

21.    "A motion for judgment on the pleadings is the proper procedure when all the material allegations of fact are admitted in the pleadings and only questions of law remain.  When the pleadings do not resolve all the factual issues, judgment on the pleadings is generally inappropriate."  *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974).

22.    "The standard of review for a Rule 12(c) motion is the same as for a motion to dismiss under Rule 12(b)(6)."  *Akzo Nobel Coatings Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *19 (N.C. Super. Ct. Nov. 3, 2011).  Thus, the Court construes the complaint liberally, *see Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009), and "view[s] the facts and permissible inferences in the light most favorable to the nonmoving party," *Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499.  "All well pleaded factual allegations in the nonmoving party's pleadings are taken as true and all contravening assertions in the movant's pleadings are taken as false."  *Id.* The Court may consider documents "attached to and incorporated within" the pleadings without converting a Rule 12(c) motion into one for summary judgment.

*Weaver v. St. Joseph of the Pines, Inc.*, 187 N.C. App. 198, 204, 652 S.E.2d 701, 707 (2007).

III.

ANALYSIS

23. Smith and Le Bleu move for judgment on the pleadings as to all of KB Farms' claims. Nature's Pearl moves only as to the claims for unfair or deceptive trade practices and tortious breach of contract. The Court first addresses arguments specific to Smith and Le Bleu before turning to arguments brought by all Defendants.

A. <u>Claims Against Smith and Le Bleu for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

24. The Complaint asserts claims for breach of contract and breach of the implied covenant of good faith and fair dealing against all Defendants. Smith and Le Bleu move for judgment under Rule 12(c) on both claims, arguing that the relevant Agreement is not enforceable against Smith and Le Bleu but "is solely a contract between" KB Farms and Nature's Pearl. (Defs.' Br. Supp. Mot. For Partial J. 6–7 ["Defs.' Br."].)

25. KB Farms first contends that Le Bleu, as "payor for the grapes" and participant "in Nature's Pearl's breach of the 2012 written agreement," is itself contractually liable. (Pl.'s Resp. to Defs.' Mot. 7 ["Pl.'s Resp."].) Additionally, KB Farms contends that Smith and Le Bleu are liable for any breach by Nature's Pearl under a theory of veil piercing. (*See* Pl.'s Resp. 7–12.)

26.     An essential element of a claim for breach of contract is the "existence of a valid contract" between two or more parties. *Carcano v. JBSS, LLC*, 200 N.C. App. 162, 168, 684 S.E.2d 41, 47 (2009) (quoting *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000)). "It is a fundamental principle of contract law that parties to a contract may bind only themselves . . . ." *Nationwide Mut. Ins. Co. v. Chantos*, 293 N.C. 431, 438, 238 S.E.2d 597, 602–03 (1977). Thus, when a defendant is "not a party to the contract," then "as a matter of law he cannot be held liable for any breach that may have occurred." *Canady v. Mann*, 107 N.C. App. 252, 259, 419 S.E.2d 597, 601 (1992).

27.     The Complaint alleges a breach only as to the 2012 Agreement, which on its face is a contract between KB Farms and Nature's Pearl. (*See generally* Agreement.) Smith and Le Bleu are not parties to that Agreement and therefore could not have breached it as a matter of law. *See Canady*, 107 N.C. App. at 259, 419 S.E.2d at 601.

28.     The Court reaches the same conclusion with respect to the covenant of good faith and fair dealing, which holds that "neither *party* will do anything which injures the right of the other to receive the benefits of the agreement." *Governor's Club Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 251, 567 S.E.2d 781, 789 (2002) (emphasis added) (citation omitted). Because Smith and Le Bleu are not parties, they could not have breached the implied covenant as a matter of law.

29.     Although KB Farms contends that Le Bleu is "intimately involved in the contractual relationship," it cites no case law supporting liability for breach of contract or breach of the implied covenant on that basis. (Pl.'s Resp. 7.) Nor does it

allege that Le Bleu consented to be bound by the terms of the Agreement. The fact that Le Bleu is "the payor for the grapes" relates only to its relationship to Nature's Pearl; it does not make Le Bleu a contractual *party*. (Pl.'s Resp. 7.)

30.  KB Farms raises an additional, alternative theory: that Smith and Le Bleu may be liable for a breach by Nature's Pearl on a theory of veil piercing. Smith and Le Bleu contend that the Complaint includes only "threadbare allegations" to support this theory, which should be dismissed. (Defs.' Br. 21.) Construing the Complaint liberally, the Court finds the allegations sufficient to permit KB Farms' veil-piercing theory to go forward.

31.  "The general rule is that in the ordinary course of business, a corporation is treated as distinct from its shareholders." *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 438, 666 S.E.2d 107, 112 (2008). "Disregarding the corporate form is not to be done lightly," *Green v. Freeman*, 367 N.C. 136, 145, 749 S.E.2d 262, 270 (2013), but is reserved only for "an extreme case where necessary to serve the ends of justice," *Dorton v. Dorton*, 77 N.C. App. 667, 672, 336 S.E.2d 415, 419 (1985).

32.  North Carolina courts will pierce the veil when a corporation is "a mere instrumentality or alter ego" of another. The plaintiff must show "domination and control of the corporate entity," "the use of that domination and control to perpetrate a fraud or wrong," and "the proximate causation of the wrong complained of by the domination and control." *Atl. Tobacco Co. v. Honeycutt*, 101 N.C. App. 160, 164, 398 S.E.2d 641, 643 (1990). Factors that may justify piercing the veil include "inadequate

capitalization, noncompliance with corporate formalities, lack of a separate corporate identity, excessive fragmentation, siphoning of funds by the dominant shareholder, nonfunctioning officers and directors, and absence of corporate records." *Green*, 367 N.C. at 145, 749 S.E.2d at 270.

33. The Complaint alleges that Defendants have disregarded the "corporate distinction" between Nature's Pearl and Le Bleu and that Smith operates both companies "as mere instrumentalities or alter egos of himself." (Compl. ¶¶ 59, 60.) Specifically, the Complaint alleges that Smith is "the sole or dominant stockholder in and chief officer" of both companies. (Compl. ¶ 60.) In addition, it alleges that Le Bleu has "assum[ed] the obligation for debts of Nature's Pearl"; that Defendants' counsel stated "that Le Bleu 'is the entity that actually pays for the grapes'"; and that the same counsel represented both Nature's Pearl and Le Bleu during negotiations for a new agreement. (Compl. ¶ 59.)

34. Smith and Le Bleu argue that no inference of complete domination is permitted solely because Smith is the companies' controlling shareholder. (Defs.' Reply 4.) If the Complaint went no further, that argument might be correct. But the Complaint and its attached exhibits could support an inference that Smith used funds from one company (Le Bleu) to pay the debts of another (Nature's Pearl). In addition, although Smith often communicated with KB Farms using Nature's Pearl letterhead, other communications were apparently on behalf of Le Bleu. (*See* Compl. Exs. B, M.)

35. Combined with the fact that Smith controls both companies, these allegations could support an inference of domination or control. *See, e.g., Strawbridge*

*v. Sugar Mt. Resort, Inc.*, 320 F. Supp. 2d 425, 439 (W.D.N.C. 2004) (applying North Carolina law and noting relevance of "centralized corporate governance"); *Network Enters. v. APBA Offshore Prods.*, No. 01 civ. 11765 (CSH), 2002 U.S. Dist. LEXIS 17256, at *10–11 (S.D.N.Y. Sept. 12, 2002) (noting failure "to observe the corporate separateness of" two companies through inconsistent usage of letterhead). It is also relevant that Smith, Nature's Pearl, and Le Bleu shared legal counsel during pre-litigation negotiations regarding an amendment to the Agreement (*see* Compl. Ex. P). *See, e.g.*, *Epic Tech., LLC v. STHR Grp., LLC*, No. 1:15cv252, 2015 U.S. Dist. LEXIS 163486, at *40 (M.D.N.C. Dec. 7, 2011) (applying North Carolina and Nevada law); *Avanti Hearth Prods., LLC v. Janifast, Inc.*, No. 3:10-cv-00019-FDW, 2010 U.S. Dist. LEXIS 79735, at *14 (W.D.N.C. Aug. 6, 2010) (applying North Carolina law).

36. The Court recognizes Smith and Le Bleu's concern that KB Farms has pleaded no facts related to inadequate capitalization, excessive fragmentation, and other alter-ego factors. (*See* Defs.' Br. 21.) At the pleading stage, however, KB Farms is not required to touch on every factor or to prove its theory, and Smith and Le Bleu have made no argument as to the second or third elements of the mere-instrumentality standard. KB Farms has provided "sufficient notice of the events that produced the claim," and the complaint does not disclose any "insurmountable bar to recovery." *Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 500, 411 S.E.2d 916, 925 (1992) (citation and quotation marks omitted); *see also Estate of Chambers v. Vision Two Hospitality Mgmt., LLC*, 2013 NCBC LEXIS 49, at *12–13 (N.C. Super. Ct. Nov. 21, 2013). In the event discovery demonstrates that KB Farms'

veil-piercing theory lacks substance, Smith and Le Bleu remain free to challenge it on summary judgment.

37. The Court therefore denies the motion for judgment on the pleadings to the extent the claims for breach of contract and breach of the covenant of good faith and fair dealing against Smith and Le Bleu rest on a theory of veil piercing.

B. Claim Against Smith and Le Bleu for Tortious Interference with Contract

38. Smith and Le Bleu also move to dismiss KB Farms' claim for tortious interference with contract. (Defs.' Br. 17–19.) To state a claim for tortious interference, a plaintiff must allege: "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damages to plaintiff." *Privette v. Univ. of N.C. at Chapel Hill*, 96 N.C. App. 124, 134, 385 S.E.2d 185, 190 (1989) (quoting *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)).

39. As this Court recently stated, "[t]he pleading standards for a tortious interference with contract claim are strict." *Urquhart v. Trenkelbach*, 2017 NCBC LEXIS 12, at *15 (N.C. Super. Ct. Feb. 8, 2017). "[T]he complaint must admit of no motive for interference other than malice." *Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 668, 674, 541 S.E.2d 733, 738 (2001). "[W]hen the complaint reveals that the interference was justified or privileged," this Court must grant a motion under Rule

12(c).  *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 220, 367 S.E.2d 647, 650 (1988).

40.    Applying this strict standard, the Court concludes that the alleged interference by Smith was justified or privileged and is therefore not actionable.  As the owner and chief officer of Nature's Pearl, Smith holds "a qualified privilege to interfere with contractual relations between" Nature's Pearl and other parties.  *Embree*, 330 N.C. at 498, 411 S.E.2d at 924 (citation omitted).  Although that privilege is not absolute, "[t]he acts of a corporate officer in inducing his company to sever contractual relations with a third party are presumed to have been done in the interest of the corporation."  *Id.* (quoting *Wilson v. McClenny*, 262 N.C. 121, 133–34, 136 S.E.2d 569, 578 (1964)).

41.    The claim against Le Bleu fails for a similar reason.  Interference with a contract is justified if the defendant's motives are "reasonably related to the protection of a legitimate business interest."  *Privette*, 96 N.C. App. at 134, 385 S.E.2d at 190.  KB Farms alleges that Le Bleu is the entity that pays for Nature's Pearl's muscadine grape purchases.  (*See, e.g.*, Compl. ¶ 59.)  Accordingly, the "complaint on its face admits" that Le Bleu had a legitimate business motive for actions related to the contract governing those payments.  *Privette*, 96 N.C. App. at 134, 385 S.E.2d at 191; *see also Remi Holdings, LLC v. IX WR 3023 HSBC Way L.P.*, 2016 NCBC LEXIS 110, at \*23 (N.C. Super. Ct. Dec. 12, 2016) (real estate broker for transaction "had a legitimate business interest" and was therefore "a non-outsider for purposes of a tortious interference claim").

42. At no point does the Complaint allege that Smith or Le Bleu acted in their own interests as opposed to their legitimate interests in Nature's Pearl's business. Paragraph 88 of the Complaint states only that Smith and Le Bleu induced Nature's Pearl not to perform its obligations under the contract. Paragraph 89 refers to other actions that Le Bleu and Smith allegedly caused Nature's Pearl to take (for example, making certain false statements). And paragraphs 90 and 91 allege that these actions were "without justification" and "malicious." These are precisely the type of "general allegations of malice" that "are insufficient as a matter of pleading." *Pinewood Homes, Inc. v. Harris*, 184 N.C. App. 597, 605, 646 S.E.2d 826, 833 (2007); *see also Stec v. Fuzion Inv. Capital, LLC*, 2012 NCBC LEXIS 24, at *24 (N.C. Super. Ct. Apr. 30, 2012) (dismissing claim where plaintiff made only "general conclusions of malice and fail[ed] to allege that Defendants acted for their own personal interest").

43. Accordingly, the Court grants Smith and Le Bleu's motion for judgment on the pleadings as to the claim for tortious interference with contract.

C. Claims Against All Defendants for Unfair or Deceptive Trade Practices and Tortious Breach of Contract

44. The remaining issues concern KB Farms' claims for unfair or deceptive trade practices and tortious breach of contract. All Defendants move for judgment on the pleadings as to these claims. (*See* Defs.' Br. 8, 12.) The basic legal issue regarding both claims is the same: whether this is the rare contract dispute that may be litigated as a tort action.

45. The courts of this State and others have long "limit[ed] the circumstances under which an ordinary contract dispute can be transformed into a tort action." *Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 345 (4th Cir. 1998) (applying North Carolina law). The reason is simple: "Parties contract partly to minimize their future risks." *Strum v. Exxon Co., USA*, 15 F.3d 327, 330 (4th Cir. 1994). Opening the door to trebling, punitive damages, and other tort remedies would upset those expectations. *See Akzo*, 2011 NCBC LEXIS 42, at *48–49.

46. For that reason, North Carolina courts have long held "that actions for unfair or deceptive trade practices are distinct from actions for breach of contract." *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992). "[A] trade practice is unfair if it 'is immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers.'" *Id.* at 61, 418 S.E.2d at 700 (quoting *Johnson v. Phoenix Mut. Life Ins. Co.*, 300 N.C. 247, 263, 266 S.E.2d 610, 621 (1980)). But N.C. Gen. Stat. § 75.1-1, which allows for treble damages, "is not intended to apply to all wrongs in a business setting." *Dalton v. Camp*, 353 N.C. 647, 657, 548 S.E.2d 704, 711 (2001). A section 75.1-1 violation "is unlikely to occur during the course of contractual performance," and "these types of claims are best resolved by simply determining whether the parties properly fulfilled their contractual duties." *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, 781 S.E.2d 889, 893 (N.C. Ct. App. 2016) (quoting *Mitchell v. Linville*, 148 N.C. App. 71, 75, 557 S.E.2d 620, 623–24 (2001)). Thus, "a mere breach of contract, *even if intentional*, is

not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1." *Branch Banking & Trust*, 107 N.C. App. at 62, 418 S.E.2d at 700 (emphasis added).

47. Accordingly, a plaintiff alleging breach of contract "must show 'substantial aggravating circumstances attending the breach to recover'" under section 75.1-1. *Eastover Ridge, L.L.C. v. Metric Constructors, Inc.*, 139 N.C. App. 360, 368, 533 S.E.2d 827, 833 (2000) (quoting *Branch Banking & Trust*, 107 N.C. App. at 62, 418 S.E.2d at 700)). The type of conduct that qualifies as aggravating circumstances is limited and "'generally involve[s] forged documents, lies, and fraudulent inducements.'" *Forest2Market, Inc. v. Arcogent, Inc.*, 2016 NCBC LEXIS 3, at *14 (N.C. Super. Ct. Jan. 5, 2016) (quoting *Stack v. Abbott Labs., Inc.*, 979 F. Supp. 2d 658, 668 (M.D.N.C. 2013)). On the other hand, "threats to terminate," "efforts to encourage" another to continue contractual performance while "planning to breach," and "refusal to otherwise meet" contractual obligations do not rise to the level of aggravating circumstances. *Deltacom, Inc. v. Budget Telecom, Inc.*, No. 5:10-cv-38-FL, 2011 U.S. Dist. LEXIS 54488, at *12–13 (E.D.N.C. May 20, 2011).

48. In view of these well-established principles, the Court concludes that KB Farms has not sufficiently alleged aggravating circumstances to support its section 75.1-1 claim. As alleged in the Complaint, Defendants falsely claimed that the 2014 harvest "did not meet the requirements of the Agreement"; "that the Agreement had been orally modified"; and "that grounds existed for terminating the Agreement." (Compl. ¶ 70.) These allegations concern nothing more than disputes over the interpretation and performance of the Agreement, which includes specific provisions

governing payment, rejection of unsuitable grapes, and the requirements for termination. (Agreement ¶¶ 2, 4, 11.) Although KB Farms alleges that Nature's Pearl breached the Agreement by withholding payment for part of the 2014 harvest and by terminating without cause (*see* Compl. ¶ 65), its potential recovery lies in the interpretation and application of the Agreement, not section 75.1-1. *See, e.g., Heron Bay Acquisition*, 781 S.E.2d at 893 (violation of "no-shop clause" was nothing "more than a simple breach of contract"); *Tar Heel Indus., Inc. v. E.I. Du Pont de Nemours & Co.*, 91 N.C. App. 51, 56–57, 370 S.E.2d 449, 452 (1988) (exercising "termination clause does not constitute an unfair or deceptive trade practice"); *Taylor v. United States*, 89 F. Supp. 3d 766, 774 (E.D.N.C. 2014) (holding that disputes over contract interpretation and performance do not state claim under section 75.1-1).

49. KB Farms attempts to distinguish this authority, contending that Defendants' actions "were in direct contravention of the requirements of the 2012 written agreement." (Pl.'s Resp. 15.) But even if Nature's Pearl breached a crystal-clear contract provision, an intentional breach is not unfair or deceptive. *See Branch Banking & Trust*, 107 N.C. App. at 62, 418 S.E.2d at 700.

50. In its response brief, KB Farms focuses on additional allegations that Defendants made false and fraudulent statements designed "to lull" KB Farms into believing the contract would remain operative through 2015 and to maximize their leverage in negotiating a new contract. (Pl.'s Resp. 16.) KB Farms alleges that Smith intended to terminate the Agreement as early as October 2014 yet falsely assured KB Farms "[w]e will work through this next year." (Compl. ¶ 70 & Ex. B.) It further

alleges that Nature's Pearl represented on October 29, 2014 that it would decide within 60 days whether to terminate; that it did not terminate the Agreement within that period; and that Defendants intentionally delayed termination until June 2015 when it would be too late for KB Farms to sell its harvest to any other customer. (*See* Compl. ¶ 70 & Ex. D; *see also* Pl.'s Resp. 16.)

51. Taken as true and construed in a light most favorable to KB Farms, these allegations concern only threats to terminate and concealed plans to breach the Agreement. They do not constitute unfair or deceptive trade practices. *See Deltacom*, 2011 U.S. Dist. LEXIS 54488, at *12–13; *see also Tar Heel*, 91 N.C. App. at 56–57, 370 S.E.2d at 452 (rejecting argument that party acted unfairly "by not notifying plaintiff that it was looking for alternatives to plaintiff's contract"); *Computer Decisions v. Rouse Office Mgmt.*, 124 N.C. App. 383, 390, 477 S.E.2d 262, 266 (1996) ("[B]y deciding not to pursue lease negotiations with plaintiff, defendants were simply exercising their right to contract freely with whomever they choose."); *United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985, 992 (4th Cir. 1981) (applying North Carolina law and holding that no "unfairness inhered in the circumstances of the breach within the meaning of the statute simply because the breach was intentional and not promptly disclosed"); *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530, 1550 (5th Cir. 1984) (applying California law and finding no case "in which misrepresentations in the performance of a contract permitted a plaintiff to recover for fraud as well as breach of contract").

52. The Court of Appeals for the Fourth Circuit has reached the same conclusion on highly similar facts. *See Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 534–36 (4th Cir. 1989). In that case, Bartolomeo entered into an agreement to distribute S.B. Thomas's English muffins in North and South Carolina. *See id.* at 532. Several years later, S.B. Thomas decided to discontinue Bartolomeo's distributorship, yet withheld that decision from Bartolomeo while instead making "repeated assurances that he did not have 'a thing to worry about.'" *Id.* at 534. Although Bartolomeo alleged that he was "knowingly misled" and "deceived" by these assurances, the Fourth Circuit pointed out that Bartolomeo received "written notice over sixty days in advance of" termination and failed to show that the allegedly deceptive statements caused any actual injury. *Id.* at 535. As a result, the alleged "conduct did not violate" section 75.1-1. *Id.*

53. Although *Bartolomeo* was decided on summary judgment, the Court finds its reasoning persuasive in considering the facts alleged in this case under Rule 12(c). KB Farms negotiated and accepted a 60-day notice period for termination, and there is no dispute that Nature's Pearl tendered written notice 60 days in advance of termination. (*See* Agreement ¶ 11; Compl. H.) Although KB Farms was not entitled to earlier notice, it was aware of the potential for termination as early as October 2014, and the parties discussed whether to amend the Agreement for several months. (*See* Compl. Exs. D, E, F, G.) When KB Farms requested assurance in February 2015 that Nature's Pearl would abide by the Agreement, Nature's Pearl instead responded

that, "[w]ith regard to doing business going forward," the company "remains willing to enter into a new agreement." (Compl. Ex. F.)

54. In short, KB Farms "had all the notice for which [it] could conceivably have asked." *Bartolomeo*, 889 F.2d at 535. The consequences of its continued performance—including disputes over delivery of the 2015 harvest—are governed by the Agreement. (*See* Compl. ¶¶ 57, 58.) KB Farms "is not entitled to recovery [under section 75.1-1] simply because its decisions to continue" performing under the Agreement "had unfavorable results." *Tar Heel*, 91 N.C. App. at 57, 370 S.E.2d at 452 (denying section 75.1-1 claim where plaintiff "continued to devote all its resources to performing" its contractual obligations, despite "knowing that the contract could be terminated on 60 days' notice").

55. Although KB Farms cites other authorities that allowed a section 75.1-1 claim to go forward, they are not on point. In *Custom Molders, Inc. v. Roper Corp.*, the defendant deceitfully *induced* a contract "when it intended not to abide by the agreement." 101 N.C. App. 606, 614, 401 S.E.2d 96, 100 (1991). Here, the Complaint does not include any similar allegations that Nature's Pearl intended not to perform when it entered into the Agreement with KB Farms in 2012.

56. KB Farms also cites *Mosley & Mosley Builders, Inc. v. Landin, Ltd.*, 97 N.C. App. 511, 389 S.E.2d 576 (1990). In that case, relying on their own interpretation of "ambiguous provisions" of a lease, the defendants "wrongfully entered plaintiff's premises" and "physically remove[d] his merchandise and property" when "plaintiff was rightfully on the premises." *Id.* at 519, 389 S.E.2d at 580. The Court of Appeals

held that the trial court properly submitted plaintiff's section 75.1-1 claim to the jury based on precedent holding that "trespass and conversion of property by a landlord could constitute unfair or deceptive trade practices." *Id.* at 518, 389 S.E.2d at 580 (citing *Love v. Pressley*, 34 N.C. App. 503, 239 S.E.2d 574 (1977)). The unusual facts of that case are clearly inapposite.

57.    The Court therefore concludes that the facts alleged by KB Farms, even if proven, do not constitute an unfair or deceptive trade practice as a matter of law. *See Dalton*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 ("The determination as to whether an act is unfair or deceptive is a question of law for the court."). At its heart, this action concerns a contract dispute, and the 2012 written Agreement governs the parties' relationship, including the duties owed to one another and the remedies for any breach. The Court grants the motion for judgment on the pleadings as to the section 75.1-1 claim.

58.    The same reasoning applies to the claim for tortious breach of contract, which is premised on the same allegedly fraudulent conduct (*see* Compl. ¶ 70). *See Taha v. Thompson*, 120 N.C. App. 697, 705, 463 S.E.2d 553, 558 (1995) (holding that claim for tortious breach of contract requires showing of aggravation). Because the allegations, even if true, do not demonstrate fraud or deception for all the reasons discussed above, the claim for tortious breach of contract fails. *See Olive v. Great Am. Ins. Co.*, 76 N.C. App. 180, 190, 333 S.E.2d 41, 46 (1985) (noting that courts approach claims for tortious breach of contract "with caution"); *Akzo*, 2011 NCBC LEXIS 42, at *48 ("Generally, then, the North Carolina courts do not recognize a

claim for tortious breach of contract."); *Forest2Market*, 2016 NCBC LEXIS 3, at *11–12 ("Because F2M alleges that the parties were performing under the contract when the purportedly tortious conduct occurred, the Court concludes that Arcogent did not owe F2M a separate and distinct duty not to provide deceptive and misleading information in these circumstances.").

59. Accordingly, the Court grants judgment on the pleadings with respect to KB Farms' claims for tortious breach of contract.

V.

CONCLUSION

60. Based on the foregoing, the Court **GRANTS in part and DENIES in part** Defendants' Motion for Partial Judgment on the Pleadings as follows:

A. The Court denies the motion as to the claims for breach of contract and breach of the implied covenant of good faith and fair dealing against Smith and Le Bleu to the extent the claim rests on a theory of veil piercing.

B. The Court grants the motion as to the claim for tortious interference with contract against Smith and Le Bleu.

C. The Court grants the motion as to the claims for unfair or deceptive trade practices and tortious breach of contract against all Defendants.

**SO ORDERED**, this the 27th day of March, 2017.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases