W & W Partners v. Ferrell Land Company, 2018 NCBC 50.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17-CVS-9998

W & W PARTNERS, INC. and CHASE
PROPERTIES, INC.,

                Plaintiffs,

      v.

FERRELL LAND COMPANY, LLC;
FERRELL INVESTMENTS LIMITED
PARTNERSHIP; DAVID S. FERRELL;
and LUANNE FERRELL ADAMS,

                Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO
DISMISS**

THIS MATTER comes before the Court on Defendants' Motion to Dismiss Claims One Through Five and Seven of Plaintiffs' Second Amended Complaint. ("Motion to Dismiss", ECF No. 23.)

THE COURT, having considered the Motion to Dismiss, the briefs filed in support of and in opposition to the Motion to Dismiss, the arguments of counsel at the hearing, and other appropriate matters of record, CONCLUDES, in its discretion, that the Motion to Dismiss should be GRANTED, in part, and DENIED, in part, for the reasons set forth below.

> *George B. Currin, for Plaintiffs W & W Partners, Inc. and Chase Properties, Inc.*

> *K&L Gates LLP, by A. Lee Hogewood, and Matthew T. Houston, for Defendants Ferrell Land Company, LLC; Ferrell Investments Limited Partnership; David S. Ferrell; and Luanne Ferrell Adams.*

McGuire, Judge.

## I.  FACTS AND PROCEDURAL BACKGROUND

1.  The Court does not make findings of fact on motions to dismiss under N.C. Gen. Stat. § 1A-1, Rule 12(b)(6) (hereinafter the Rules of Civil Procedure are referred to only as "Rule(s)"), but only recites those facts included in the Complaint that are relevant to the Court's determination of the Motion to Dismiss.  *See, e.g., Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986).

2.  Plaintiff W & W Partners, Inc. ("W&W") is a real estate development company.  Plaintiff Chase Properties, Inc. ("Chase") is a real estate broker or agent. Collectively, W&W and Chase are referred to herein as "Plaintiffs."

3.  Defendant Ferrell Land Company, LLC ("FLC") is a limited liability company formed on December 14, 1995, and is in the business of land development. Defendants David S. Ferrell ("David"), Luanne Ferrell Adams ("Luanne"), and their father, Omer Ferrell ("Omer"), were the original managing members of FLC.  (Sec. Amended Compl., ECF No. 13, at ¶ 3.)  David and Luanne are the current managing members of FLC.  Omer is deceased.

4.  On May 13, 1998, Defendant Ferrell Investments Limited Partnership ("FILP") was formed.  (ECF No. 13, at ¶ 4.)  David and Luanne are general partners in FILP.  (*Id.* at ¶¶ 5 and 6.)

5.  On January 1, 1996, Plaintiffs and FLC entered into a Management, Development and Exclusive Agency Agreement.  (ECF No. 13, Ex. A; hereinafter "the

Management Agreement.") David, Luanne, and FILP were not parties to the Management Agreement.

6. The Management Agreement provides that FLC "intends to acquire, develop, and market the real property described in Exhibit A [to the Management Agreement] ('Land') as lots for residential, commercial, office and retail development." (*Id.*, Ex. A at p. 1.) Exhibit A to the Management Agreement is a map or plat showing the specific real property FLC intended to acquire (hereinafter, the real property will be referred to as the "Land"). The developed Land was to be known as "the Carpenter Village Planned Unit Development" (hereinafter the developed Land will be referred to as "the Development"). (ECF No. 13, at ¶ 9.)

7. Under the Management Agreement, W&W was to develop the Land, including "obtaining entitlements, permitting, zoning, rezoning, site plan approval, and other customer development tasks." (ECF No. 13, at ¶ 10.) Chase agreed to market and sell the Land. (*Id.*) FLC agreed to compensate W&W by paying it 5% of the "hard costs" of the improvement to the Land and 20% of the net profit from sale of the Development. (ECF No. 13, Ex. A at pp. 10–11.) FLC agreed to compensate Chase through payment of brokerage fees. (*Id.* at p. 10.)

8. FLC did not own any of the Land when the Parties executed the Management Agreement. (ECF No. 13, at ¶ 18.) The Land was owned by Omer, other members of the Ferrell family, and third parties. (*Id.*) The Land was to be acquired and developed on a parcel-by-parcel basis in 19 "Phases." (ECF No. 13, at ¶ 11.) The Parties prepared pro forma projected income and expense statements

showing the projected costs for development, marketing, and sale for each of the 19 Phases. (ECF No. 13, Ex. C.)

9. FLC acquired the parcels for Phases 1–17, and portions of Phases 18 and 19. (ECF No. 13, at ¶ 12.) Plaintiffs developed, marketed, and sold Phases 1–17, as well as the acquired portions of Phases 18 and 19. (*Id*. at ¶¶ 23–24.) FLC did not acquire the remaining portions of Phases 18 and 19. (*Id*. at ¶¶ 12–13.) Instead, FILP acquired the remaining portions of Phases 18 and 19, and such remaining portions of Phases 18 and 19 acquired by FILP are hereinafter referred to as "the Disputed Property." (*Id*. at ¶ 12.)

10. In March 2002, David asked Plaintiffs to enter into an amendment of the Management Agreement to explicitly exclude the Disputed Property from the Land. (ECF No. 13, at ¶ 31; ECF No. 13, Ex. E (hereinafter the "Proposed Amendment").) The Proposed Amendment changed the definition of the "Land" in the Management Agreement to state as follows:

> The term Land shall <u>not</u> include any of the "Excluded Land" identified on Exhibit A or any other property not expressly listed on Exhibit A. Any property not included herein which may in the future be identified, considered or purchased for incorporation into the Carpenter Village PUD shall not be subject to the terms of this Agreement unless expressly added to this Agreement by written amendment executed by both parties.

(ECF No. 13, Ex. E at sec. 1.7 (emphasis in original).) The Proposed Amendment defined "Excluded Land" as "[a]ny property now owned by [FILP] on the north side of Morrisville-Carpenter Road . . . [and] certain property under contract with Wake

County School Board owned by [David] and [Luanne] and [FILP]." (ECF No. 13, Ex. E at p. 21.) Plaintiffs refused to agree to the Proposed Amendment. (*Id*. at ¶ 31.)

11. On July 3, 2003, the Parties entered into an amendment to the Management Agreement. (*Id*. at ¶ 8; ECF No. 13, Ex. B (hereinafter, "the Amendment").) The Amendment, which was purportedly to "clarify the terms of the [Management] Agreement," provided that FLC "shall acquire" a discreet part of the Land described in the Management Agreement; set the acquisition cost for that part of the land for purposes of calculating W&W's share of the net profits; and provided that "except as expressly amended . . . the [Management] Agreement is hereby reaffirmed in all regards." (ECF No. 13, Ex. B.) The Parties dispute the significance of the Amendment.

12. In December 2016, Plaintiffs learned that FILP had entered into a contract to sell the Disputed Property to a third-party. (ECF No. 13, at ¶ 32.) Plaintiffs demanded that FLC acquire the Disputed Property, but to date FLC has refused. (*Id*. at ¶ 40.) Plaintiffs allege that FLC has breached the Management Agreement by refusing to acquire the Disputed Property. (*Id*. at ¶¶ 45–46.) Defendants have also refused to permit Plaintiffs to participate in the development, marketing, or sale of the Disputed Property. (*Id*. at ¶ 41.) Plaintiffs allege that "David [ ] and Luanne [ ], as managers of [FLC] and partners of [FILP] are refusing to perform [FLC]'s obligations [under the Management Agreement] in order to personally realize a higher profit from the sale of [the Disputed Property] and to

deprive [W&W] and Chase of the benefit of their bargain under the [Management Agreement]." (*Id.* at ¶ 42.)

13.     On August 18, 2017, Plaintiffs filed their Complaint in this action. (Compl., ECF No. 3.)   Plaintiffs subsequently filed an Amended Complaint on September 29, 2017, (Amended Compl., ECF No. 9), and a Second Amended Complaint on October 27, 2017.   (ECF No. 13.)   The Second Amended Complaint alleges claims for: breach of contract against FLC for failure to acquire the Disputed Property (*Id.* at ¶¶ 43–47); specific performance against all Defendants (*Id.* at ¶¶ 48–52); piercing the corporate veil against all Defendants (*Id.* at ¶¶ 53–61); unfair and deceptive trade practices against all Defendants (*Id.* at ¶¶ 62–65); constructive trust against FILP (*Id.* at ¶¶ 66–68); breach of listing agreement against FLC and David (*Id.* at ¶¶ 69–78); and breach of contract against FLC for failure to pay W&W the "net profits" as calculated by the Management Agreement (*Id.* at ¶¶ 79–84).

14.     On December 29, 2017, Plaintiffs filed a Motion for Preliminary Injunction.  (ECF No. 20.)  On March 8, 2018 the Court denied Plaintiffs' Motion for Preliminary Injunction.  (Order on Pls.' Mot. for PI, ECF No. 61.)

15.     On December 29, 2017, Defendants filed the Motion to Dismiss and an accompanying brief in support of the Motion to Dismiss.  (Def. Br. Supp. Mot. Dismiss, ECF No. 24.) On February 1, 2018, Plaintiffs filed a brief in opposition to the Motion to Dismiss. (Pl. Br. Opp. Def. Mot. Dismiss, ECF No. 45.)  On February 26, 2018, Defendants filed a reply brief.  (Def. Reply Supp. Mot. Dismiss, ECF No. 52.)  The

Motion to Dismiss has been fully briefed. On March 6, 2018 the Court heard oral arguments on the Motion to Dismiss, and it is now ripe for disposition.

## II.    ANALYSIS

16.    In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). Our appellate courts frequently reaffirm that North Carolina is a notice pleading state. *See, e.g., Feltman v. City of Wilson*, 238 N.C. App. 246, 252, 767 S.E.2d 615, 620 (2014) (quoting *Wake Cty. v. Hotels.com, L.P.*, 235 N.C. App. 633, 646, 762 S.E.2d 477, 486 (2014)). "Under notice pleading, a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine of *res judicata*, and to show the type of case brought." *Hotels.com, L.P.*, 235 N.C. App. at 646, 762 S.E.2d at 486.

17.    Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the plaintiff's claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985). Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in

support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted).

18. The Court construes the Complaint liberally and accepts all allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009). However, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005).

19. The Court may consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers, including a contract that forms the subject matter of the action. *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001).

20. In the Motion to Dismiss, Defendants seek dismissal of Plaintiffs' First, Second, Third, Fourth, Fifth, and Seventh Causes of Action. At the hearing on March 6, 2018, Plaintiffs stated their belief that the sale of the Disputed Property to a third party rendered moot Plaintiffs' Second Cause of Action for Specific Performance. The Court interprets Plaintiffs' concession as a voluntary dismissal of the Second Cause of Action.

### A. Plaintiffs' First and Seventh Causes of Action: Breach of Contract

21. In their First Cause of Action, Plaintiffs allege that FLC breached the Management Agreement by failing to acquire the Disputed Property. (ECF No. 13, at ¶¶ 44–46.) As a Seventh Cause of Action, Plaintiffs also allege that FLC has not

paid W&W the net profits due under section 6.3 of the Management Agreement for W&W's work, to-date, on the development of Phases 1 through 17, and the included parts of Phases 18 and 19. (*Id*. at ¶¶ 80–83.) Defendants make no argument in support of their motion to dismiss the Seventh Cause of Action, except to argue that David, Luanne, and FILP are not parties to the Management Agreement, and any claim for breach of contract against them must fail. (ECF No. 24, at p. 8.) While it does not appear that Plaintiffs attempt to state a claim under the Seventh Cause of Action against any Party other than FLC, to the extent the Seventh Cause of Action attempts to state claims against David, Luanne, or FILP, Defendants' motion to dismiss should be GRANTED. Except as specifically granted, Defendants' motion to dismiss the Seventh Cause of Action should be DENIED.

22. "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 842 (2000). It is well-established that "a valid contract between two parties can only exist when the parties assent to the same thing in the same sense, and their minds meet as to all terms." *Normile v. Miller*, 313 N.C. 98, 103, 326 S.E.2d 11, 15 (1985) (internal quotation omitted).

23. "With all contracts, the goal of construction is to arrive at the intent of the parties when the contract was issued. The intent of the parties may be derived from the language in the contract." *Bank of Am., N.A. v. Rice*, 230 N.C. App. 450, 456, 750 S.E.2d 205, 209 (2013) (quotation omitted); *see also, Lane v. Scarborough*, 284 N.C. 407, 409–10, 200 S.E.2d 622, 624 (1973) ("Whenever a court is called upon

to interpret a contract its primary purpose is to ascertain the intention of the parties at the moment of its execution.") The intention of the parties "is to be ascertained from the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time." *Lane*, 284 N.C. at 410, 200 S.E.2d at 624 (quoting *Electric Co. v. Ins. Co.*, 229 N.C. 518, 520, 50 S.E.2d 295, 297 (1948)). In analyzing the intent of the parties "[t]he court must construe the contract 'as a whole' and [its provisions] must be appraised in relation to all other provisions." *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 362 N.C. 269, 273, 658 S.E.2d 918, 921 (2008) (internal quotation omitted). "It is presumed that each part of the contract means something." *Brown v. Lumbermens Mut. Casualty Co.*, 326 N.C. 387, 393, 390 S.E.2d 150, 153 (1990). "The various terms of the [contract] are to be harmoniously construed, and if possible, every word and every provision is to be given effect." *Duke Energy Corp. v. Malcolm*, 178 N.C. App. 62, 65, 630 S.E.2d 693, 695 (2006); *see also*, *In re Foreclosure of a Deed of Trust*, 210 N.C. App. 409, 415, 708 S.E.2d 174, 178 (2011) (quoting *Duke Energy*).

24. "When the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court and the court cannot look beyond the terms of the contract to determine the intentions of the parties." *Bank of Am., N.A*, 230 N.C. App. at 456, 750 S.E.2d at 209 (quotation omitted); *see also, Lynn v. Lynn*, 202 N.C. App. 423, 431, 689 S.E.2d 198, 204 (2010). "Whether or not the language of a contract is ambiguous [ ] is a question for the court to determine." *Lynn*, 202 N.C. App. at 432, 689 S.E.2d at 205.

25. The Parties agree that the Management Agreement is a valid and binding contract, but differ as to whether it obligated FLC to acquire the Disputed Property. Defendants argue that the language of the Management Agreement, specifically the phrase "Owner[1] *intends* to acquire," unambiguously reflects the intent of the Parties at the time they entered into the Management Agreement that FLC was not obligated to acquire the Land but merely intended or hoped to acquire the Land, and that FLC's contractual obligations under the Management Agreement would arise only once FLC actually acquired some or all of the Land. (ECF No. 24, at pp. 3–4, 8–10 (emphasis added).) Defendants contend that, because FLC was not required to acquire any of the Land, it did not breach the Management Agreement by failing to acquire the Disputed Property.

26. Defendants contend that "the [Management] Agreement is not ambiguous. It plainly contains no obligation for [FLC] to purchase the Disputed Property." (ECF No. 24, at p. 10.) Rather, Defendants argue, the Management Agreement merely states FLC's intention to purchase the Land, but "leaves the details of any such purchase to [FLC]'s discretion." (*Id*. at p. 8.) Defendants claim FLC's only obligations under the Management Agreement were to establish a Project Account" with a bank, and to "act diligently and in good faith." (*Id* (citing ECF No. 13, Ex. A at p. 10).) In addition, Defendants argue that the Amendment created the only obligation on FLC to acquire any of the Land, and that the portion of the Land that is the subject of the Amendment does not include the Disputed Property. (ECF

---

[1] The Management Agreement defines "Owner" as FLC.

No. 24, at p. 9.) Defendants contend that the unambiguous terms of the Management Agreement establish that Plaintiffs' claim for breach of contract in Count One must fail.

27. Plaintiffs argue that in order to carry out the intentions of the Parties, the Management Agreement must be read as containing an unexpressed, implied term that FLC "would acquire, or make reasonable efforts to acquire" the Land, including the Disputed Property. (ECF No. 45, at pp. 10–14.) Plaintiffs argue that the Management Agreement, when read as a whole, reflects the Parties' intention that FLC was obligated to acquire the Land, including the Disputed Property. Plaintiffs bolster their argument with citations to North Carolina case law in which North Carolina courts have enforced implied terms that are necessary to carry out the intent of the parties to a contract. *Lane*, 284 N.C. at 410, 200 S.E.2d at 624 ("A contract, however, encompasses not only its express provisions but also all such implied provisions as are necessary to effect the intention of the parties unless express terms prevent such inclusion."); *see also, Strader v. Sunstates Corp.*, 129 N.C. App. 562, 569, 500 S.E.2d 752, 755–56 (1998) (quoting *Lane*). In *Lane*, the Court held

> Intention or meaning in a contract may be manifested or conveyed either expressly or impliedly, and it is fundamental that that which is plainly or necessarily implied in the language of a contract is as much a part of it as that which is expressed. If it can be plainly seen from all the provisions of the instrument taken together that the obligation in question was within the contemplation of the parties when making their contract or is necessary to carry their intention into effect, the law will imply the obligation and enforce it. The policy of the law is to supply in contracts what is presumed to have been inadvertently omitted or to have been deemed perfectly obvious by the

> parties, the parties being supposed to have made those stipulations which as honest, fair, and just men they ought to have made.
>
> . . .
>
> The court will be prepared to imply a term if there arises from the language of the contract itself, and the circumstances under which it is entered into, an inference that the parties must have intended to stipulation in question.

284 N.C. at 410-11, 200 S.E.2d at 624-25.

28. In *Strader*, the plaintiff, Strader, entered into a 20 year lease with the defendant Crossroad and alternatively referred to as Sunstates, for a piece of unimproved property. The lease permitted, but did not require, Sunstates to develop the land for a retail store location, and Strader agreed he would subordinate his interest in the property to allow Sunstates to obtain financing for construction and development. *Strader*, 129 N.C. App. at 565, 500 S.E.2d at 753. Sunstates subsequently obtained a loan from Lafayette Life Insurance Company for the purposes of financing the development. *Id*. at 565, 500 S.E.2d at 754. Strader subordinated his interest so that Lafayette could take a security interest in the property, and a retail store was constructed on the property. *Id*. Sunstates later ceased making the financing payments to Lafayette and defaulted on the loan. *Id*. Lafayette purchased to property in foreclosure. Sunstates stopped making rent payments, and Strader sued Sunstates and other affiliated companies for breach of the lease. *Id*. at 565–66, 500 S.E.2d at 754.

29. The trial court entered judgment for damages in favor of Strader, finding that although the lease did not contain an explicit provision requiring Sunstates to

make the financing payments on any loan it obtained, "the lease contained an implied provision that [Sunstates] would make all necessary financing payments to any creditor." *Strader*, 129 N.C. App at 566, 500 S.E.2d at 754. Defendants appealed, and the Court of Appeals affirmed. Applying the principle set forth in *Lane*, *supra*, the Court of Appeals held that "the lease includes an implied term that Sunstates is obligated to pay any financing charges incurred in constructing improvements on the leased property." *Id*. at 570, 500 S.E.2d at 756. The Court in *Strader* reasoned that, "[t]he express terms [of the lease] are free from ambiguity and the provision that we have determined to exist in the lease is one which is plainly implied by the language of the contract." *Strader*, 129 N.C. App. at 570, 500 S.E.2d at 756.

30. Plaintiffs argue that the express terms of the Management Agreement create an implied obligation on FLC to acquire the Land, including the Disputed Land. First, Plaintiffs contend that the Management Agreement expressly states that FLC "intends to acquire, develop and market" the Land, and in order to carry out this intent "an obligation on the part of [FLC] to acquire the Land subject to the [Management] Agreement must be implied." (ECF No. 45, at p. 12.) Second, Plaintiffs argue that the fact that the Management Agreement contains geographical restrictions on Plaintiffs' right to acquire, develop, and sell property within a two-mile radius around the entirety of the Land, including the Disputed Property, shows the Parties' intent that FLC would acquire all of the Land. (ECF No. 45, at p. 12.)

31. Applying the above-cited rules of contract construction to the terms of the Management Agreement, Plaintiffs have sufficiently alleged a claim for breach of

contract in their First Cause of Action. Construing the Management Agreement as a whole, and considering "the expressions used, the subject matter, . . . the purpose sought, and the situation of the [P]arties at the time," the Management Agreement is neither clear nor unambiguous with regard to whether or not FLC had an obligation to acquire the Land. *Electric Co.*, 229 N.C. at 520, 50 S.E.2d at 297. Instead, the Management Agreement could be interpreted as requiring that FLC acquire the Land, including the Disputed Property. The subject matter of the Management Agreement was the Land and the "Project," which is defined "the Land, together with any Improvements." (ECF No. 13, Ex. A at p. 2.) The Land is defined as all of the 19 Phases, including the Disputed Property. The purpose of the Management Agreement was, in significant part, to provide Plaintiffs with the right to develop, market, and sell the Project. (*Id.* at pp. 3–4.) The subject matter and purpose of the Management Agreement could support the allegation that the Management Agreement obligated FLC to acquire the Land.

32. In addition, the expressions used by the Parties in the Management Agreement could support a conclusion that the Parties intended for FLC to be obligated to acquire the Land. The Management Agreement explicitly provides that FLC intends to acquire the Land. The terms used in the agreement suggest that the Management Agreement was intended to encompass the overall development and sale of the complete residential and commercial property comprising the Land. For example, in the Management Agreement "'Development Plan' means a plan . . . for the *overall* development, construction, management, ownership, sale, advertising and

public relations of the Project." (*Id.* at p. 2 (emphasis added)), and "'Substantial Completion' or 'Substantially Complete' shall mean when ninety five (95%) percent of the total acreage of the Commercial Land and 95% of the total acreage of the Residential Land has been sold." (*Id.* at p.3.)

33. The language used in Article 2 of the Management Agreement also indicates that FLC intended that W&W would act as its exclusive agent in developing, marketing, and selling all 19 Phases of the Land. Section 2.1 states

> (a) [FLC] engages [W&W] as [FLC]'s exclusive agent for the coordination and marketing of the Project; and (b) [FLC] grants to [W&W] the right to list and offer *the Land and all portions thereof* and interests therein for sale, exchange or other disposition or transfer upon such terms as [FLC] may from time to time approve. [W&W] agrees to use commercially reasonable, good faith efforts to procure purchasers for *the Land and all portions thereof* during the term of this Agreement. . . . All inquiries to [FLC] with respect to the purchase, exchange or other disposition or transfer *of the Land or any portion thereof* or interest therein will be referred to [W&W], and all negotiations connected therewith will be conducted by or with the participation of [W&W].

(ECF No. 13, Ex. A at sec. 2.1 (emphasis added).)

34. The fact that the Parties created detailed pro forma projected income and expense statements for the property contained in all 19 Phases of the Land also would support Plaintiffs' contention that the Parties intended FLC to be obligated to purchase all of the Land, including the Disputed Property. Additionally, the Management Agreement provides that FLC will pay W&W "20% of the net profits of the Project," and not on a phase-by-phase basis. (*Id.* at sec. 6.3.) The compensation

provision could support an inference that the Parties intended W&W to share in the profits generated by the sale of all of the Land.

35.     The Court concludes that the Management Agreement does not unambiguously establish that FLC was not obligated to acquire the Land, including the Disputed Property, for development and sale by Plaintiffs.  Plaintiffs have adequately pleaded a breach of the terms of the Managing Agreement by alleging that FLC did not make reasonable efforts to acquire the Disputed Property. Defendants' motion to dismiss the First Cause of Action for breach of contract should be DENIED.

### B. Plaintiffs' Third Cause of Action: Piercing the Corporate Veil

36.     In their Third Cause of Action, Plaintiffs allege that "David [ ] and Luanne [ ] exercise actual and complete control over [FLC] and [FILP]", and "[FLC] and [FILP] are mere alter egos and instrumentalities of David [ ] and Luanne [ ]." (ECF No. 13, at ¶¶ 54–55.)  Plaintiffs further allege that "[FLC] and [FILP] have acted as a single enterprise to acquire, develop and sell the Land [ ], such that their corporate identities should be disregarded."  (*Id*. at ¶ 58.)  Plaintiffs contend that David and Luanne acquired the Disputed Property for FILP in order to avoid FLC's contractual obligations to Plaintiffs.  (*Id*. at ¶¶ 59, 61.) Plaintiffs appear to claim that they should be allowed to reach FILP's assets and/or hold David and Luanne individually responsible for any liability imposed in this case.

37.     As a preliminary matter, Defendants correctly point out that piercing the corporate veil is an ancillary equitable remedy and not an independent cause of

action.  (ECF No. 24, at pp. 15–16.); *Green v. Freeman*, 367 N.C. 136, 146, 749 S.E.2d 262, 271 (2013) ("The doctrine of piercing the corporate veil is not a theory of liability. Rather, it provides an avenue to pursue legal claims against corporate officers or directors who would otherwise be shielded by the corporate form"); *USA Trouser, S.A. de C.V. v. Williams*, 2016 NCBC LEXIS 58, at \*25 (N.C. Super. Ct. July 16, 2016) (same). Nevertheless, Defendants argue that Plaintiffs' Third Cause of Action should be dismissed because, *inter ali*a, Plaintiffs make only conclusory allegations, and do not plead facts, in support of their veil-piercing theory.  (ECF No. 24, at p. 17.)

38.     In North Carolina, "[t]he general rule is that in the ordinary course of business, a corporation is treated as distinct from its shareholders."  *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC,* 362 N.C. 431, 438, 666 S.E.2d 107, 112, (2008).  In proper circumstances, however, a court can look behind the corporate form and disregard the corporation's separate and independent existence. *Id.* at 438-39, 666 S.E.2d at 112.  Our appellate courts have repeatedly cautioned that disregarding the corporate form, or piercing the corporate veil, is a remedy that "should be invoked only in an extreme case where necessary to serve the ends of justice."  *Dorton v. Dorton*, 77 N.C. App. 667, 672, 336 S.E.2d 415 (1985).  "Piercing the corporate veil . . . allows a plaintiff to impose legal liability for a corporation's obligations, or for torts committed by the corporation, upon some other company or individual that controls and dominates a corporation.  *Henderson v. Sec. Mortg. & Fin. Co.*, 273 N.C. 253, 260, 160 S.E.2d 39, 44 (1968) (citations omitted); *Fischer Inv. Capital, Inc. v. Catawba Dev. Corp.*, 200 N.C. App. 644, 650, 689 S.E.2d 143, 147 (2009) ("A

corporation which exercises actual control over another, operating the latter as a mere instrumentality or tool, is liable for the torts of the corporation thus controlled. In such instances, the separate identities of parent and subsidiary or affiliated corporations may be disregarded.") (quotation omitted). Courts will pierce the corporate veil to prevent the misuse of the corporate form for a fraudulent purpose or to avoid an unconscionable result. *See, Ridgeway Brands Mfg., LLC*, 362 N.C. at 438-39, 666 S.E.2d at 112–13.

39.     In order to pierce the corporate veil, a party must show "that the corporation is so operated that it is a mere instrumentality or *alter ego* of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State." *Green*, 367 N.C. at 145, 749 S.E.2d at 270 (citation omitted). The "instrumentality rule" inquiry involves three elements:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of [a] plaintiff's legal rights; and
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Id*. at 145-46, 749 S.E.2d at 270 (internal citations omitted).

40.     Factors relevant to the Court's analysis include "inadequate capitalization, noncompliance with corporate formalities, lack of a separate corporate

identity, excessive fragmentation, siphoning of funds by the dominant shareholder, nonfunctioning officers and directors, and absence of corporate records." *Id.* at 145, 749 S.E.2d at 270 (internal citations omitted); *see also, Glenn v. Wagner*, 313 N.C. 450, 455-58, 329 S.E.2d 326, 330-32 (1985).

> It is not the presence or absence of any particular factor that is determinative. Rather, it is a combination of factors which, when taken together with an element of injustice or abuse of corporate privilege, suggest that the corporate entity attacked had 'no separate mind, will or existence of its own' and was therefore the 'mere instrumentality or tool' of the dominant [shareholder].

*Atlantic Tobacco Co. v. Honeycutt*, 101 N.C. App. 160, 164-165, 398 S.E.2d 641, 643 (1990) (citation omitted).

41. In this case, the totality of Plaintiffs' allegations in support of their veil-piercing theory consists of a rote recitation of the factors enunciated by North Carolina's appellate courts. Plaintiffs allege that David and Luanne "dominate and control" FLC and FILP; that FLC and FILP are "mere alter egos and instrumentalities" of David and Luanne, and have "no independent identit[ies]"; and that "[u]pon information and belief, FLC is "not sufficiently capitalized to pay damages . . . to Plaintiffs." (*Id.* at ¶¶ 52, 54, 55, 57, and 60.) Plaintiffs, however, do not plead any facts showing how David and Luanne have dominated either company, how they have operated the companies as instrumentalities or alter egos, or on what basis Plaintiffs believe FLC is undercapitalized. The Court is not required to accept these "bare legal conclusions" in the absence of any supporting facts. *Blue Ridge Pediatric & Adolescent Med., Inc. v. First Colony Healthcare, LLC*, 2012 NCBC LEXIS

52, at *15–16 (N.C. Super. Ct. Oct. 3, 2012). In addition, Plaintiffs do not allege "noncompliance with corporate formalities, . . . excessive fragmentation, siphoning of funds by the dominant shareholder, nonfunctioning officers and directors, [or] absence of corporate records" regarding FLC or FILP. *Green*, 367 N.C. at 145, 749 S.E.2d at 270.

42.     Plaintiffs have not sufficiently alleged a claim for piercing the corporate veil.   Therefore, Defendants' motion to dismiss Plaintiffs' Third Cause of Action should be GRANTED, and Plaintiffs' veil-piercing allegations should be DISMISSED WITHOUT PREJUDICE.

### C. *Plaintiffs' Fourth Cause of Action: UDTPA*

43.     The Court notes at the outset that, in the Fourth Cause of Action, Plaintiffs make allegations regarding "Defendant's conduct," (ECF No. 13, at ¶¶ 63 and 64), but also allege that Plaintiffs have been damaged by "Defendants' unfair and deceptive practices." (*Id.* at ¶ 65.)  For purposes of deciding the Motion to Dismiss, the Court treats the claim for violation of the UDTPA as being alleged against all of the Defendants.

44.     In the Fourth Cause of Action, Plaintiffs allege that "Defendant's [*sic*] conduct, as alleged herein, was unfair and deceptive and in violation of [the UDTPA]." (ECF No. 13, at ¶ 64.)   Plaintiffs allege that "Defendants'" position that the Management Agreement does not obligate them to acquire the Disputed Property is unfair and deceptive because Plaintiffs believed the Management Agreement required FLC to acquire the Disputed Property.  (*Id.* at ¶¶ 26–28.)  In other words,

Plaintiffs allege that the Parties' competing interpretations of the Management Agreement, which underlies Plaintiffs' claim for breach of contract, is also the basis of the UDTPA claim. Defendants argue that the UDTPA claim must be dismissed since it is based on a breach of contract and Plaintiffs have not alleged substantial aggravating factors accompanying the breach of the Management Agreement. (ECF No. 24, at pp. 13–14; ECF No. 52, at pp. 6–7.)

45. "To establish a prima facie case of unfair and deceptive trade practices, a plaintiff must show that (1) the defendant committed an unfair or deceptive act or practice, (2) the act was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 303, 603 S.E.2d 147, 161 (2004). Whether an act or practice is unfair or deceptive is ultimately a question of law for the Court. *Songwooyarn Trading Co. v. Sox Eleven, Inc.*, 213 N.C. App. 49, 56, 714 S.E.2d 162, 167 (2011).

46. "A mere breach of contract, even if intentional, is not an unfair or deceptive act under Chapter 75." *Bob Timberlake Collection, Inc. v. Edwards,* 176 N.C. App. 33, 42, 626 S.E.2d 315, 323 (2006) (citing *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir. 1989) and *Skinner v. E. F. Hutton & Co., Inc.*, 314 N.C. 267, 275, 333, S.E.2d 236, 241 (1985)); *see also, Gunn v. Simpson, Schulman & Beard, LLC*, 2011 NCBC LEXIS 35, at *34–35 (N.C. Super. Ct. Sept. 23, 2011) ("[C]laims regarding the existence of an agreement, the terms contained in an agreement, and the interpretation of an agreement are relegated to the arena of contract law and are not properly addressed as unfair and deceptive trade practice claims.") (citing

*Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331, 347 (4th Cir. 1998)). In order for a breach of contract to provide the basis for a claim for unfair or deceptive trade practices, "a party must show substantial aggravating circumstances attending the breach." *Bob Timberlake*, 176 N.C. App. at 42, 626 S.E.2d at 323.

47. Plaintiffs contend that FLC not only breached the Management Agreement, but also engaged in conduct that was deceptive. (ECF No. 45, at pp. 15–17.) The conduct cited by Plaintiffs in support of their contention, however, all arises from FLC's alleged failure to fulfill its obligations under the Management Agreement, and the Parties' differing interpretations of the terms of the agreement. (*Id*.) "Plaintiff[s have] not alleged the type of substantial aggravating circumstances, such as fraud, necessary to transform a breach of contract into a section 75-1.1 claim." *Strategic Mgmt. Decisions v. Sales Performance Int'l*, 2017 NCBC LEXIS 69, at *9, (N.C. Super. Ct. Aug. 7, 2017). Plaintiffs have not sufficiently alleged a violation of the UDTPA.

48. Defendants' motion to dismiss Plaintiffs' Fourth Cause of Action for Unfair and Deceptive Trade Practices should be GRANTED.

### D. *Plaintiffs' Fifth Cause of Action: Constructive Trust*

49. Plaintiffs ask the Court to place a constructive trust, for Plaintiffs' benefit, on the proceeds from the sale of the Disputed Property currently held by FILP. (ECF No. 13, at ¶¶ 66–68.) Plaintiffs allege that "it would be inequitable and unjust for [FILP] to receive the proceeds from the sale of the remaining portions of [the Disputed Property] or the profits from the development of the remaining portions

of [the Disputed Property] . . . without compensating Plaintiffs pursuant to the terms of the Contract." (*Id.* at ¶ 67.)

50. "A constructive trust . . . arises when one obtains the legal title to property in violation of a duty he owes to another. Constructive trusts ordinarily arise from actual or presumptive fraud and usually involve the breach of a confidential relationship." *Tuwamo v. Tuwamo*, 790 S.E.2d 331, 338, 2016 N.C. App. LEXIS 769, at *18 (2016) (quoting *Fulp v. Fulp*, 264 N.C. 20, 22, 140 S.E.2d 708, 711 (1965)).

> A constructive trust is a duty, or relationship, imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust.

*Wake Cty. v. Hotels.com, L.P.*, 235 N.C. App. 633, 653-54, 762 S.E.2d 477, 490 (2014) (quoting *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 530, 723 S.E.2d 744, 751 (2012)).

51. Defendants argue that the claim for a constructive trust should be dismissed because Plaintiffs have an adequate remedy at law, and therefore cannot pursue the equitable remedy of a constructive trust. (ECF No. 45, at p. 19.) Defendants assert that Plaintiffs' alleged damages in this case can be remedied by an award of money damages. (*Id.*) Defendants also argue that because Plaintiffs do not allege that FILP owed any direct fiduciary or other duty to Plaintiffs, a constructive trust is not an available remedy against FILP in this lawsuit. (*Id.* at pp. 20–21.) On the other hand, Plaintiffs contend that they do not have to allege fraud or a fiduciary duty owed to them by FILP in order to be entitled to a constructive trust, and that "a

constructive trust may be imposed on the basis of any circumstance which makes it inequitable for . . . David [ ], Luanne [ ] or FILP, to retain the proceeds of the sale of the property at issue which rightfully belong to Plaintiffs." (ECF No. 45, at p. 20; citing *Roper v. Edwards*, 323 N.C. 461, 465, 373 S.E.2d 423, 425 (1988) ("A constructive trust is imposed to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust" (internal quotation marks omitted).)

52.     The Court has thoroughly reviewed the pleadings in the Second Amended Complaint and the arguments raised by the Parties. Although it appears unlikely that Plaintiffs will be able to establish grounds, or even the need, for a constructive trust in this action, Plaintiffs have alleged sufficient facts to make dismissal of the claim for a constructive trust at this early stage of the case inappropriate. Defendants' motion to dismiss Plaintiffs Fifth Cause of Action for constructive trust should be DENIED.

### E. *Statute of limitations arguments*

53.     Finally, Defendants argue that Plaintiffs' claims for breach of contract in their First Cause of Action and their claim for violation of the UDTPA are barred by the applicable statutes of limitations. (ECF No. 24, at pp. 21–23.) Defendants contend that FLC's request to amend the Management Agreement, in March 2002, to remove the Disputed Property from the scope of the Land put Plaintiffs on notice that

Defendants did not believe the Disputed Property was covered by the Management Agreement. (*Id.*) Defendants argue that Plaintiffs' claims, which are based on the Parties' differing interpretations of the Management Agreement, accrued no later than March 2002 and are barred by the applicable statute of limitations. (*Id.*) Defendants' argument is without merit. The Proposed Amendment just as reasonably supports the Plaintiffs' claim that Defendants knew that the Disputed Property was included, but were seeking to remove it from the scope of the Land as defined in the Management Agreement. Defendants have not established that Plaintiffs' claims are time-barred as pleaded in the Second Amended Complaint. Accordingly, Defendants' motion to dismiss Plaintiffs' First Cause of Action for breach of contract on statute of limitations grounds should be DENIED.

## III. CONCLUSION

54. THEREFORE, IT IS ORDERED that the Motion to Dismiss is GRANTED, in part, and DENIED, in part, as follows:

55. The motion to dismiss Plaintiffs' First Cause of Action for breach of contract is DENIED.

56. The motion to dismiss Plaintiffs' Second Cause of Action for specific performance is DENIED, AS MOOT.

57. The motion to dismiss Plaintiffs' Third Cause of Action for piercing the corporate veil is GRANTED, and the Cause of Action is DISMISSED WITHOUT PREJUDICE.

58.     The motion to dismiss Plaintiffs' Fourth Cause of Action for violation of the UDTPA is GRANTED, and the Cause of Action is DISMISSED.

59.     The motion to dismiss Plaintiffs' Fifth Cause of Action for Constructive Trust is DENIED.

60.     The motion to dismiss Plaintiffs' Seventh Cause of Action for breach of contract is DENIED.


    SO ORDERED, this the 22nd day of May, 2018.


                              /s/ Gregory P. McGuire
                              Gregory P. McGuire
                              Special Superior Court Judge for
                              Complex Business Cases